## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| In re: | : |
| | : Chapter 11 |
| RADIOSHACK CORPORATION, *et al.*, | : |
| | : Case No. 15-10197 (BLS) |
| Debtors. | : |
| | : (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| Salus Capital Partners, LLC, in its capacity as Agent, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| Standard Wireless Inc.; General Wireless Inc.; Standard | :   Adv. Proc. No. _____ |
| General L.P.; General Retail Holdings L.P.; General | : |
| Retail Funding LLC; Litespeed Master Fund, Ltd.; | : |
| Litespeed Management, L.L.C.; Cantor Fitzgerald | : |
| Securities LLC; BlueCrest Multi Strategy Credit Master | : |
| Fund Limited; DW Catalyst Master Fund, Ltd.; DW | : |
| Value Master Fund, Ltd.; Saba Capital Management, LP; | : |
| Macquarie Credit Nexus Master Fund Limited; Taconic | : |
| Opportunity Master Fund L.P.; Taconic Master Fund 1.5 | : |
| L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital | : |
| Management, LP.; and John Does #1-50, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ADVERSARY COMPLAINT

Plaintiff Salus Capital Partners, LLC, as agent for the SCP Lenders (defined below) under the SCP Credit Agreement (defined below) ("SCP Agent" or "Plaintiff"), through its undersigned counsel, for its complaint against the defendants, hereby alleges on knowledge with respect to itself and its actions and on information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.       This is an action for declaratory judgment and other relief enforcing an intercreditor agreement between the SCP Agent (for the benefit of the SCP Lenders) and the agent for the ABL Lenders (defined below) governing their respective rights, priorities and obligations regarding the collateral pledged to each group to secure repayment of their loans provided to RadioShack[1] in December 2013.

2.       On December 10, 2013, RadioShack obtained an $835 million financing package of which (a) $250 million was provided by the SCP Lenders as a term loan (the "SCP Term Loan"), and (b) $585 million was provided by General Electric Capital Corporation ("GE Capital") and a syndicate of asset-based lenders (the "ABL Lenders") in the form of (i) a $50 million term loan (the "ABL Term Loan") and (ii) $535 million in asset-based revolving loan commitments (the "ABL Revolving Loan Commitments").  All of RadioShack's obligations to the SCP Lenders and the ABL Lenders were secured by liens on the same collateral pool – substantially all of RadioShack's assets. To set forth the relative rights and priorities of the SCP Lenders, on the one hand, and the ABL Lenders, on the other hand, the secured creditors entered into an intercreditor agreement on the closing date (the "Intercreditor Agreement").   In relevant part, the Intercreditor Agreement provided that the ABL Term Loan and the ABL Revolving Loan Commitments were secured on a first-lien basis on the liquid assets (principally accounts

---

[1]   The Debtors (collectively, "RadioShack") include the following entities: RadioShack Corporation; Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising Support Services, Inc.; RadioShack Customer Service LLC; RadioShack Global Sourcing Corporation; RadioShack Global Sourcing Limited Partnership; RadioShack Global Sourcing, Inc.; RS Ig Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; Tandy Finance Corporation; Tandy Holdings, Inc.; Tandy International Corporation; TE Electronics LP; Trade and Save LLC; and TRS Quality, Inc.

receivable and inventory) of RadioShack (the "Liquid Collateral"), and the SCP Term Loan was secured by the Liquid Collateral on a second-lien basis.[2]

3.    Under the Intercreditor Agreement, the ABL Lenders and the SCP Lenders agreed to limit the amount of the ABL Lenders' loans that could be secured by the Liquid Collateral on a senior priority basis to the SCP Term Loan.  However, in October 2014, GE Capital and its syndicate assigned all of their loans and obligations to a new group of ABL Lenders (the "Hedge Fund Lenders"), including defendants Standard General, Litespeed and their affiliates.  The Hedge Fund Lenders and RadioShack then amended the terms of their credit agreement (the "ABL Credit Agreement"), among other things, to (i) permanently reduce the asset-based ABL Revolving Loan Commitments by $275 million, of which approximately $232 million in borrowing was then outstanding, and (ii) convert those revolving loans (*i.e.*, loans that could be re-borrowed when repaid, subject to borrowing base requirements) into term loans (*i.e.*, loans that could not be re-borrowed when repaid) (the "Term Out Loans").  As explained in detail below, this amendment significantly reduced the amount of the ABL Lenders' loans entitled to priority over the SCP Term Loan.

4.    Since the Hedge Fund Lenders made the $232 million of Term Out Loans to RadioShack in October 2014, approximately $129 million has been repaid, and $103 remains outstanding.  Because the Term Out Loans are contractually subordinated to the SCP Term Loan, the $129 million repaid to the Hedge Fund Lenders must be disgorged and paid over to the SCP

---

[2]    The Intercreditor Agreement also provided that the SCP Term Loan was secured on a first-priority basis on the fixed assets of Radio Shack (*e.g.*, real estate, improvements, intellectual property and capital stock), and the ABL Term Loan and the ABL Revolving Loan Commitments were secured on a second-lien basis by such fixed assets; however, the liens (and relative priorities of such liens with respect to the ABL Lenders and the SCP Lenders) on the fixed asset collateral are not in dispute.

Lenders, and the $103 million outstanding balance cannot be repaid until the SCP Term Loan is satisfied in full.

5.       Moreover, under the Intercreditor Agreement, only outstanding balances under the ABL Term Loan ($50 million) and loans made out of the reduced ABL Revolving Loan Commitments (approximately $61 million under a letter of credit facility) may be credit bid in a bankruptcy sale unless and until the SCP Term Loan is repaid in full.  Therefore, pursuant to the Intercreditor Agreement and applicable law, the Hedge Fund Lenders should not be permitted to credit bid in excess of approximately $111 million of outstanding ABL Term Loan and reduced ABL Revolving Loan Commitment obligations.

6.       Therefore, Plaintiff seeks an order (i) awarding specific performance of the Intercreditor Agreement, (ii) requiring disgorgement to the SCP Lenders of all payments received by the Hedge Fund Lenders on account of the Term Out Loans, and (iii) declaring the total maximum amount of the Hedge Fund Lenders' senior secured claims pursuant to the Intercreditor Agreement and precluding the Hedge Fund Lenders (and their affiliates) from credit bidding more than that amount in any transaction in these chapter 11 cases before the SCP Term Loan is repaid in full.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§157, 1334 and 2201.

8.       This adversary proceeding is a core proceeding pursuant to pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O) and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

9.       Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**APPLICABLE LAW**

10.     The Intercreditor Agreement is enforceable against the Hedge Fund Lenders in these cases pursuant to Bankruptcy Code Section 510(a).

11.     The parties expressly agreed in Section 12.7 of the Intercreditor Agreement that it "shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York."

12.     Section 12.8 of the Intercreditor Agreement provides that the parties may demand specific performance of the agreement.

**PARTIES**

13.     Plaintiff is a Delaware limited liability company with its principal place of business at 197 First Avenue, Suite 250, Needham Heights, MA 02494-2816.

14.     Defendant Standard General L.P. ("Standard General") is a Delaware limited partnership with its principal place of business at 767 Fifth Avenue, 12th Floor, New York, NY 10153.

15.     Defendants Standard Wireless Inc., General Wireless Inc.,  General Retail Holdings L.P. ("GRH") and General Retail Funding LLC ("GRF") are affiliates of Standard General.  In addition, defendants GRH and GRF are ABL Lenders.

16.     Defendants Litespeed Master Fund, Ltd. and Litespeed Management, L.L.C. (together, "Litespeed") are affiliates and ABL Lenders.

17.     Defendant Cantor Fitzgerald Securities LLC is the administrative and collateral agent in connection with the ABL Credit Agreement.

18.     Defendants BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd., Saba Capital Management, LP,

Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund L.P., Taconic Master Fund 1.5 L.P., T. Rowe Price Associates, Inc., and Mudrick Capital Management, LP are ABL Lenders.

19.     Defendants John Does #1-50 are additional participating ABL Lenders and related parties, or recipients of proceeds, whose identities are not yet known but will be developed through discovery.

## FACTUAL BACKGROUND

**A.     The SCP Credit Agreement**

20.     On or about December 10, 2013, Salus Capital Partners, LLC, Salus CLO 2012-1, Ltd., Cerberus Levered Loan Opportunities Fund II, LP, Cerberus NJ Credit Opportunities Fund, L.P. and Cerberus ASRS Holdings LLC (collectively, the "SCP Lenders") entered into a credit agreement with RadioShack (the "SCP Credit Agreement").  Under this agreement, the SCP Lenders agreed to provide the $250 million SCP Term Loan to RadioShack and related entities.  Each SCP Lender appointed Plaintiff as agent for the SCP Lenders to, among other things, "take such action on [each SCP Lender's] behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent" under the SCP Credit Agreement and related agreements and "exercise such powers as are incidental thereto."

21.     Pursuant to the related SCP Security Agreement,[3] repayment of the obligations outstanding under the SCP Credit Agreement was secured by a lien on substantially all of RadioShack's existing and after acquired assets, including (i) a first priority lien on fixed assets, intellectual property, and stock and other equity interests of RadioShack's subsidiaries, and (ii) a second priority lien on RadioShack's Liquid Collateral.

---

[3]   Guaranty and Security Agreement, dated as of December 10, 2013, by RadioShack and in favor of Salus Capital Partners, LLC, as Agent for the SCP Lenders (the "SCP Security Agreement").

22.     When the SCP Lenders extended the loan, RadioShack already was experiencing financial distress, with reported losses of $139.4 million and $400.2 million in 2012 and 2013, respectively.  Despite its poor financial condition, RadioShack was able to obtain $835 million in new financings from the SCP Lenders and the ABL Lenders, the proceeds of which were to be used to repay existing debt and fund an operational turnaround.  Given RadioShack's tenuous financial condition, the SCP Lenders carefully negotiated the agreements governing their loan – including the Intercreditor Agreement – to include specific provisions to protect their investments and maximize their ability to recover all of the amounts they loaned.  These protections included security interests in all of RadioShack's Liquid Collateral to secure repayment of the obligations, as well as Intercreditor Agreement provisions requiring that only the ABL Term Loan and asset-based revolving loans could come ahead of the SCP Lenders' liens on RadioShack's Liquid Collateral.  The SCP Lenders relied on each of the terms of the related agreements in connection with their agreement to provide the SCP Term Loan.

23.     Pursuant to the terms of the SCP Credit Agreement, on December 10, 2013, the SCP Lenders advanced the $250 million SCP Term Loan to RadioShack.  Substantially all of the principal balance remains outstanding.

**B.     The ABL Credit Agreement**

24.     The same day that RadioShack and the SCP Lenders closed the SCP Term Loan, RadioShack also entered into a secured credit facility (the "ABL Credit Agreement") with the separate ABL Lender syndicate led by GE Capital.

25.     Under the ABL Credit Agreement, the ABL Lenders agreed to provide to RadioShack a $535 million revolving asset-based credit facility and the $50 million ABL Term Loan (together, the "ABL Loans").

26.    Pursuant to the ABL Guaranty and Security Agreement, dated as of December 10, 2013, by RadioShack and in favor of GE Capital, as agent for the ABL Lenders, the ABL Credit Agreement was secured by substantially all of RadioShack's existing and after acquired assets, including (i) a first priority lien on RadioShack's Liquid Collateral, and (ii) a second priority lien on RadioShack's fixed assets, intellectual property, and stock and other equity interests of RadioShack's subsidiaries.

## C.    The Intercreditor Agreement

27.    In connection with the SCP Credit Agreement and the ABL Credit Agreement, Salus Capital, as agent for the SCP Lenders, and GE Capital, as agent for the ABL Lenders, entered into the Intercreditor Agreement, dated as of December 10, 2013.  The Intercreditor Agreement sets forth the respective rights, priorities and obligations of the two groups of secured lenders with respect to the RadioShack collateral pledged to each group to secure repayment of their loans.  Thus, the Intercreditor Agreement governs the relative priority of the SCP Lenders' and the ABL Lenders' secured claims in respect of one another.

28.    Among the bargained-for protections provided to the SCP Lenders under the Intercreditor Agreement are restrictions limiting the ABL Lenders' senior liens (i) to a "Maximum ABL Facility Amount" and (ii) to those resulting from asset-based revolving loans (other than the ABL Term Loan).  These provided important protections and comforts to the SCP Lenders because, among other reasons, the ABL Lenders' facility would be constrained by a revolver borrowing base and would be agented by an experienced asset-based lender (such as GE Capital, the original agent), who would establish appropriate discretionary reserves and otherwise behave in the customarily conservative manner of asset-based lenders.

**D.      The October 2014 Transactions**

29.      In a Form 10-Q filed with the United States Securities and Exchange

Commission on September 11, 2014, RadioShack disclosed its dire financial condition:

> If acceptable terms of a sale or partnership or out-of court
> restructuring cannot be accomplished, we may not have enough cash and
> working capital to fund our operations beyond the very near term, which
> raises substantial doubt about our ability to continue as a going concern. As
> a result, we may be required to seek to implement an in-court proceeding
> under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy
> Code").

30.      Shortly thereafter, the SCP Lenders learned from media reports citing

RadioShack management that RadioShack had determined to enter into transactions with its two

largest shareholders, defendants Standard General and Litespeed, to facilitate an amendment to

the ABL Credit Agreement in order to obtain additional liquidity.

31.      Specifically, on October 3, 2014, RadioShack entered into a series of

agreements (collectively, the "October 2014 Transactions") with, among others, defendants GRH

and GRF, which were formed by defendant Standard General solely for the purpose of engaging

in these transactions with RadioShack.  The stated purpose of the October 2014 Transactions –

including a loan sale agreement and an amendment to the ABL Credit Agreement – was to

restructure RadioShack's debt under the ABL Credit Agreement and to provide RadioShack with

additional short-term liquidity.  As a result of this integrated series of transactions, RadioShack's

two largest shareholders (and their affiliates and related funds) acquired the ABL Loans and

became the replacement ABL Lenders.

32.      First, RadioShack arranged a Loan Sale Agreement pursuant to which

GRH and GRF acquired from GE Capital and the other original ABL Lenders all of their

interests in the ABL Loans and related financial commitments under the ABL Credit Agreement.

Shortly thereafter, the other named defendants herein acquired participating interests in the ABL Loans.

33.     Second, RadioShack entered into a First Amendment to the ABL Credit Agreement (the "First Amendment") with the new ABL Lenders and Cantor Fitzgerald, which succeeded GE Capital as the administrative agent for the lenders under the amended ABL Credit Agreement.  Among other changes, the First Amendment:

(i) permanently reduced the asset-based ABL Revolving Loan Commitments by $275 million, from $535 million to $260 million (comprised $140 million of asset-based revolving loan commitments that were never funded and a $120 million letter of credit facility);

(ii) converted $275 million of what previously had been available for revolving loans (*i.e.*, loans that could be re-borrowed when repaid) into term loans (*i.e.*, loans that could not be re-borrowed when repaid) (the "Term Out Loans"), of which, at the time of the amendment, approximately $232 million in borrowings were then outstanding; these are, in fact, term loans, notwithstanding the First Amendment's definition of them as "Term Out ***Revolving*** Loans" (emphasis added); and

(iii) released discretionary reserves and restored the method used to calculate the borrowing base under the ABL Credit Agreement to the one in effect in December 2013, which increased RadioShack's borrowing availability by approximately $142 million.

**E.     The Intercreditor Agreement Limits ABL Lenders' Priority Secured Claims.**

34.     The Term Out Loans resulting from the October 2014 Transactions are ***not*** Senior ABL Claims secured by Senior Liens pursuant to the Intercreditor Agreement.  Rather, as

explained below, under the priority of liens provisions agreed to among the secured lenders, the

ABL Lenders' secured claims with respect to the Term Out Loans are subordinated to the SCP

Lenders' secured claims under the terms of the Intercreditor Agreement.

35.      Section 2.1(a) of the Intercreditor Agreement provides:

> Notwithstanding the date, manner or order of grant, attachment or
> perfection of any Junior Lien in respect of any Collateral or of any ***Senior***
> ***Lien*** in respect of any Collateral and notwithstanding any provision of the
> UCC, any applicable law or any Collateral Document, . . . any ***Senior Lien***
> in respect of such Collateral, regardless of how acquired, whether by grant,
> statute, operation of law, subrogation or otherwise, shall be and shall remain
> senior and prior to any Junior Lien in respect of such Collateral.

(Emphasis added).

36.      With respect to the ABL Priority Collateral, Section 1.2 of the

Intercreditor Agreement provides as follows:

(i)  A "Senior Lien" is a lien securing all "Senior ABL Claims."

(ii) "Senior ABL Claims" are "all ABL Claims other than Excluded ABL

Claims."

(iii) "Excluded ABL Claims" include "the aggregate outstanding principal amount

of loans and outstanding amount of Letters of Credit made, issued or incurred

pursuant to the ABL Loan Documents in excess of the Maximum ABL Facility

Amount at the time of such making, issuance or incurrence and any interest, fees

or reimbursement obligations accrued on or with respect to such excess amounts."

(iv) The "Maximum ABL Facility Amount" is "the Aggregate Revolving Loan

Commitments minus any permanent reductions in the Revolving Loan

Commitments."

37.     Pursuant to the First Amendment to the ABL Credit Agreement, the ABL Lenders agreed to "term out" – *i.e.*, convert to the Term Out Loans – approximately $275 million of revolving asset-based loans.  Since the Term Out Loans no longer constituted revolving loans, the Revolving Loan Commitments were permanently reduced by $275 million, resulting in a reduction of the Maximum ABL Facility Amount under the Intercreditor Agreement to $260 million (*i.e.*, the original $535 million in revolving commitments minus $275 million in commitments that were permanently reduced by "terming out" the related revolving loans).

38.     When the ABL Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $260 million,[4] and thus the Maximum ABL Facility Amount was exceeded by $275 million.

39.     Therefore, pursuant to the Intercreditor Agreement, that $275 million of commitments for Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, with the result that the Term Out Loans are subordinated to the SCP Term Loan with respect to the Liquid Collateral.  The outstanding balance of the Term Out Loans in October 2014 was approximately $232  million, of which about $129 million has been repaid to the Hedge Fund Lenders, leaving a present balance of $103 million.  Accordingly, the $129 million in repayments improperly received by the Hedge Fund Lenders belongs, and must be disgorged to, the SCP Lenders, and the remaining balance of $103 million is contractually subordinated to the SCP Lenders' secured claims.

---

4   In total, there remained $310 million of outstanding commitments, including the original $50 million ABL Term Loan facility which is a senior lien claim not addressed or disputed by this Complaint.

**F.      The Term Out Loans Are Not Revolving Asset-Based Loans.**

40.      Separate and apart from the permanent reduction of the ABL Revolving Loan Commitment, the Intercreditor Agreement independently prohibits the Term Out Loans from being repaid with the proceeds of Liquid Collateral prior to repayment in full of the SCP Term Loan because they are term loans, not asset-based revolving loans.

41.      The Intercreditor Agreement explicitly provides that the only loans (other than the ABL Term Loan) that may be secured by the Liquid Collateral on a senior basis to the SCP Term Loan are asset-based revolving loans.

42.      The Term Out Loans could not be re-borrowed once repaid and, therefore, were no longer revolving loans in name, form or substance.  The altered nature of the Term Out Loans also stripped from the SCP Lenders their bargained-for protections and comforts traditionally associated with subordination to revolving asset-based loans.

43.      As a result of the conversion of asset-based revolving loans to term loans held by the Hedge Fund Lenders, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral prior to the repayment in full of the SCP Term Loan, and, therefore, payments received by the Hedge Fund Lenders on account of their Term Out Loans must be disgorged to the SCP Lenders.

**G.      Closing Date Definitions Govern**

44.      The Intercreditor Agreement allows the ABL Lenders' loans to be secured by RadioShack's Liquid Collateral on a senior basis to the SCP Lenders' loans only to the extent the ABL loans are revolving asset-based facilities in amounts less than the "Maximum ABL Facility Amount."

45.      The Intercreditor Agreement's definition of "Maximum ABL Facility Amount" references certain defined terms from the ABL Credit Agreement.  Importantly,

Section 1.2 of the Intercreditor Agreement (titled "Definitions"), provides, "[u]nless otherwise defined herein, terms are used herein as defined in the ABL Credit Agreement as in effect on the date hereof."  (Emphasis added)  The Intercreditor Agreement is dated as of December 10, 2013. Therefore, the definitions of the ABL Credit Agreement relevant to these issues are the definitions as of December 10, 2013, other than amendments expressly permitted by the Intercreditor Agreement.

46.     However, in connection with October 2014 Transactions, the ABL Lenders changed certain defined terms in the ABL Credit Agreement through the First Amendment, including the definition of "Revolving Loan Commitment," which was changed to include "[ABL] Lender's Outstanding Term Out *Revolving* Loans" (emphasis added) within its definition.  This change was not permitted by the Intercreditor Agreement.

47.     By this simple sophistry, the First Amendment purports to re-characterize the ABL Lenders' Term Out Loans as revolving asset-based loans for purposes of the loan documents.

48.     But that is not how the term was defined on December 10, 2013 – the relevant date for these purposes – and, more importantly, that is not what the SCP Lenders bargained for when they agreed to permit only true revolving asset-based loans to come ahead of the SCP Lenders' liens on RadioShack's Liquid Collateral.

## FIRST CAUSE OF ACTION
### Declaratory Judgment

49.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

50.     At the time the ABL Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the

ABL Credit Agreement was reduced to $260 million, and thus the Maximum ABL Facility Amount was exceeded by $275 million.  Pursuant to the Intercreditor Agreement, that $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims. Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full.

51.    An actual legal and substantial controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

52.    Plaintiff is entitled to a declaratory judgment that, pursuant to the Intercreditor Agreement, the maximum total amount of the ABL Lenders' remaining senior secured claims under the ABL Credit Agreement is $111 million.

## SECOND CAUSE OF ACTION
### Declaratory Judgment

53.    Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

54.    Pursuant to the Intercreditor Agreement, the maximum total amount of the ABL Lenders' senior secured claims under the ABL Credit Agreement is $111 million.

55.    The maximum total amount the ABL Lenders are entitled to credit bid under Bankruptcy Code Section 363 cannot exceed the maximum total amount of the ABL Lenders' senior secured claims under the ABL Credit Agreement.

56.    Standard General and its affiliates are currently involved in a competitive sale process for certain of the Debtors' assets in which they intend to credit bid and have indicated they may include the claims of other ABL Lenders in their bid.

57.     An actual legal and substantial controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

58.     Plaintiff is entitled to a declaratory judgment that, pursuant to the Intercreditor Agreement, the maximum total amount that the ABL Lenders and their affiliates are entitled to credit bid under Bankruptcy Code Section 363 in any sale process is $111 million.

### THIRD CAUSE OF ACTION
### Declaratory Judgment

59.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

60.     At the time the ABL Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $260 million, and thus the Maximum ABL Facility Amount was exceeded by $275 million.  Pursuant to the Intercreditor Agreement, that $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims. Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full.

61.     Since the First Amendment closing date, approximately $103 million of the Term Out Loans remains outstanding, and with respect to which the SCP Lenders hold senior secured claims under the Intercreditor Agreement.

62.     An actual legal and substantial controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

63.     Plaintiff is entitled to a declaratory judgment that, pursuant to the Intercreditor Agreement, the SCP Lenders hold senior secured claims with priority over the $275 million of Term Out Loans with respect to the Liquid Collateral.

## FOURTH CAUSE OF ACTION
### Disgorgement

64.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

65.     At the time the ABL Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $260 million, and thus the Maximum ABL Facility Amount was exceeded by $275 million.  Pursuant to the Intercreditor Agreement, that $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims. Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full.

66.     Since the First Amendment closing date, approximately $129 million of the Term Out Loans have been repaid to the ABL Lenders contrary to the terms of the Intercreditor Agreement, and with respect to which the SCP Lenders hold senior secured claims under the Intercreditor Agreement.

67.     The ABL Lenders have no legitimate claim to these amounts and will be unjustly enriched if not forced to disgorge these amounts.

68.     The ABL Lenders should be forced to disgorge these amounts and/or the value of the benefit derived therefrom to the SCP Lenders.

69.    The ABL Lenders hold these amounts in constructive trust for the benefit of the SCP Lenders.

70.    Plaintiff is entitled to a judgment requiring the Hedge Fund Lenders to disgorge any and all amounts received in connection with the Term Out Loans.

71.    All disgorged amounts should be paid the SCP Lenders pursuant to the terms of the Intercreditor Agreement.

### FIFTH CAUSE OF ACTION
**Breach Of Contract And Specific Performance**

72.    Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

73.    Section 12.8 of the Intercreditor Agreement provides that the parties may demand specific performance of the agreement.

74.    At the time the ABL Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $260 million, and thus the Maximum ABL Facility Amount was exceeded by $275 million.  Pursuant to the Intercreditor Agreement, that $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims. Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full.

75.    By collecting payments, and asserting priority over the SCP Term Loan with respect to the Liquid Collateral, including for purposes of making a credit bid for RadioShack assets, on account of the Term Out Loans, the ABL Lenders have breached and are continuing to breach the Intercreditor Agreement.

76.     Plaintiff is entitled to a judgment of specific performance with respect to the ABL Lenders' obligations under the Intercreditor Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Issue a declaratory judgment determining the maximum total amount of the ABL Lenders' senior secured claims with respect to the Liquid Collateral under the ABL Credit Agreement and pursuant to the Intercreditor Agreement;

B. Issue a declaratory judgment determining the maximum total amount the ABL Lenders and their affiliates are entitled to credit bid under Bankruptcy Code Section 363 in any sale process;

C. Issue a declaratory judgment that, pursuant to the Intercreditor Agreement, the SCP Lenders hold senior secured claims on the Liquid Collateral with respect to the $275 million of Term Out Loans;

D. Order the ABL Lenders to disgorge to the SCP Lenders any and all amounts received in connection with the Term Out Loans;

E. Order the ABL Lenders to specifically perform their obligations under the Intercreditor Agreement;

F. Award reasonable attorneys' fees and costs; and

G. Award such other and further relief that the Court deems just and proper.

Dated:        Wilmington, Delaware
              March 17, 2015

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

/s/ Anthony W. Clark
Anthony W. Clark (I.D. No. 2051)
Jason M. Liberi (I.D. No. 4425)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone:  (302) 651-3000
email: anthony.clark@skadden.com
email: jason.liberi@skadden.com

- and -

Jay M. Goffman
Mark A. McDermott
Four Times Square
New York, New York 10036-6522
Telephone:  (212) 735-3000
email: jay.goffman@skadden.com

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Cantor Fitzgerald Securities LLC, BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd.; Saba Capital Management, LP, Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund L.P., Taconic Master Fund 1.5 L.P., Mudrick Capital Management, LP., and John Does #1-50*

CHOATE, HALL & STEWART LLP


*/s/ John F. Ventola*
John F. Ventola
Douglas R. Gooding
Sean M. Monahan
Two International Place
Boston, Massachusetts 02110
Phone: (617) 248-5000
Facsimile: (617) 248-4000
email: jventola@choate.com
email: dgooding@choate.com
email: smonahan@choate.com

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Standard Wireless Inc., General Wireless Inc., Standard General L.P., General Retail Holdings L.P., General Retail Funding LLC, Litespeed Master Fund, Ltd., Litespeed Management, L.L.C., and T. Rowe Price Associates, Inc.*