## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------

| | |
|---|---|
| *In re* | : |
| | :    Chapter 11 |
| RADIOSHACK CORPORATION, *et al.*, | : |
| | :    Case No. 15-10197 (BLS) |
| Debtors. | :    (Jointly Administered) |

-----------------------------------------------------------------

| | |
|---|---|
| Salus Capital Partners, LLC, in its capacity as Agent, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| Standard Wireless Inc.; General Wireless Inc.; Standard | : |
| General L.P.; General Retail Holdings L.P.; General Retail | : |
| Funding LLC; Litespeed Master Fund, Ltd.; Litespeed | : |
| Management, L.L.C.; Cantor Fitzgerald Securities LLC; | : |
| BlueCrest Multi Strategy Credit Master Fund Limited; DW | : |
| Catalyst Master Fund, Ltd.; DW Value Master Fund, Ltd.; | :    Adv. Proc. No. 15-50239 (BLS) |
| Saba Capital Management, LP; Macquarie Credit Nexus | : |
| Master Fund Limited; Taconic Opportunity Master Fund L.P.; | :    **Re: Dkt. No. 15** |
| Taconic Master Fund 1.5 L.P.; T. Rowe Price Associates, Inc.; | : |
| Mudrick Capital Management, LP; and John Does #1-50, | : |
| | : |
| Defendants. | : |

-----------------------------------------------------------------

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF THE ABL LENDERS TO DISMISS THE ADVERSARY COMPLAINT OF SALUS CAPITAL PARTNERS, LLC

**BLANK ROME LLP**
Stanley B. Tarr, Esq. (No. 5535)
Victoria A. Guilfoyle, Esq. (No. 5183)
1201 Market Street, Suite 800
Wilmington, DE 19801
Tel: 302-425-6400

*Counsel to funds managed or advised by BlueCrest
Capital Management (New York) LP, DW
Partners, L.P., Macquarie Credit Investment
Management Inc., Mudrick Capital Management,
LP, Saba Capital Management, L.P., T. Rowe
Price Associates, Inc. and Taconic Capital
Advisors L.P.*

**MORRIS NICHOLS ARSHT & TUNNELL LLP**
Robert J. Dehney, Esq. (No. 3578)
Gregory W. Werkheiser, Esq. (No. 3553)
Matthew B. Harvey, Esq. (No. 5186)
1201 Market Street, Suite 1600
Wilmington, DE 19801
Tel:  302-658-9200

*Counsel to General Wireless Inc., Standard
General L.P., General Retail Holdings L.P., and
General Retail Funding LLC*

Date:  May 1, 2015

# TABLE OF CONTENTS

PAGE

NATURE AND STAGE OF THE PROCEEDING.........................................................................1

SUMMARY OF ARGUMENT .................................................................................................1

STATEMENT OF FACTS .......................................................................................................3

I.      Salus's Factual Allegations..........................................................................................3

II.     The Intercreditor Agreement........................................................................................6

III.    Salus's Claims...............................................................................................................9

LEGAL STANDARD............................................................................................................11

ARGUMENT........................................................................................................................12

I.      The Intercreditor Agreement Unambiguously Protects The ABL Lenders' Rights To
        Receive And Retain Routine Payments From RadioShack ...............................................12

        A.      The Intercreditor Agreement Does Not Subordinate The ABL Lenders' Right To
                Receive Routine Payments Under Any Circumstances.........................................12
        B.      Under The Intercreditor Agreement The ABL Lenders Are Entitled To Retain All
                Routine Payments, Which Cannot Be Disgorged .................................................14
        C.      Disgorgement Is Also Unavailable For Salus's Breach of Contract Claim Under
                New York Law........................................................................................................15

II.     The First Amendment Did Not Reduce The Maximum ABL Facility Amount Or
        Otherwise Affect Salus's Credit Exposure In Any Way ..................................................16

        A.      The First Amendment Did Not Reduce The Maximum ABL Facility Amount....17
        B.      The Intercreditor Agreement Expressly Permits the Amendments To Which Salus
                Now Objects...........................................................................................................20
        C.      Salus's Claims Additionally Fail Because Salus Concedes That The Loans Were
                Already Outstanding At The Time Of The First Amendment...............................21
        D.      Even Assuming The First Amendment Reduced the Maximum ABL Facility
                Amount to $260 Million, That Reduction Would Be Insufficient To Trigger Any
                Obligation To Pay The SCP Lenders.....................................................................22

III.    Salus Waived Its Claims By Tactically Waiting to File The Complaint ..........................23

IV.     The Sale Order Moots Salus's Remaining Non-Disgorgement Claims............................25

CONCLUSION……………………………………………………………………………..27

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

*In re AE Liquidation, Inc.*,
    435 B.R. 894 (Bankr. D. Del. 2010) .....................................................................26

*Amegy Bank Nat'l Ass'n v. Deutsche Bank Corp.*,
    917 F. Supp. 2d 1228 (M.D. Fla. 2013) ................................................................15

*Am. Express Bank Ltd. v. Uniroyal, Inc.*,
    164 A.D.2d 275 (1st Dep't 1990) ..........................................................................12

*In re AMF Bowling Worldwide, Inc.*,
    278 B.R. 96, 101 (Bankr. E.D. Va. 2002) .............................................................25

*In re Benedict*,
    90 F.3d 50 (2d Cir. 1996) ......................................................................................26

*In re Chandler*,
    459 B.R. 215 (Bankr. E.D. Pa. 2011) ...................................................................26

*Diceon Elec., Inc. v. Calvary Partners, L.P.*,
    772 F. Supp. 859 (D. Del. 1991) ...........................................................................24

*In re Emmons-Sheepshead Bay Dev. LLC*,
    518 B.R. 212 (E.D.N.Y. 2014) .............................................................................25

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ..................................................................................11

*Franconero v. Universal Music Corp.*,
    No. 02 Civ. 1963 (BSJ), 2011 WL 566794 (S.D.N.Y. Feb. 11, 2011) .................16

*Gen. Elec. Capital v. Union Planters*,
    409 F.3d 1049 (8th Cir. 2005) ...............................................................................15

*Gladstein v. Martorella*,
    75 A.D. 3d 465 (1st Dep't 2010) ...........................................................................15

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) ............................................................................................12

*Lusardi v. Xerox Corp.*,
    975 F.2d 964 (3d Cir. 1992)............................................................................26

*Orix Credit Alliance, Inc. v. Sovran Bank, N.A.*,
    4 F.3d 1262 (4th Cir. 1993) ........................................................................15

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d. Cir. 1996).......................................................................12

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
    998 F.2d 1192 (3d Cir. 1993).................................................................11, 12

*Pot Luck, LLC v. Freeman*,
    No. 06 Civ. 10195 (DAB), 2010 WL 908475 (S.D.N.Y. Mar. 8, 2010) .................................16

*In re Premier Int'l Holdings, Inc.*,
    443 B.R. 320 (Bankr. D. Del. 2010) ....................................................................11

*In re Price*,
    370 F.3d 362 (3d Cir. 2004)...........................................................................27

*In re Rockefeller Ctr. Properties, Inc. Securities Litig.*,
    184 F.3d 280 (3d Cir. 1999)...........................................................................11

*In re SHC, Inc.*,
    329 B.R. 438 (Bankr. D.Del. 2005) .....................................................................11

*Square Mile Structured Debt (one) LLC v. Swig*,
    Nos. 603825/08, 600613/10, 2010 WL 4167253 (N.Y. Sup. Ct. Oct. 15, 2010) ....................15

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    380 F. Supp. 2d 250 (S.D.N.Y. 2005)..................................................................16

STATUTES & RULES

U.C.C. § 9-332...........................................................................................15

The ABL Lenders (the "ABL Lenders"),[1] by and through their undersigned counsel, hereby file this brief in support of their motion to dismiss the Adversary Complaint ("Adversary Complaint" or "Complaint") filed by Salus Capital Partners, LLC ("Salus") in its capacity as agent for the SCP Lenders ("SCP Lenders").[2]

## NATURE AND STAGE OF THE PROCEEDING

On March 17, 2015, Salus, as agent on behalf of the SCP Lenders, filed its Adversary Complaint naming as defendants the ABL Lenders and Cantor Fitzgerald Securities LLC, as agent for the ABL Lenders.  By stipulation, the ABL Lenders and Salus agreed that initial responsive pleadings by the ABL Lenders are due to be filed on May 1, 2015.  The Pretrial Conference is currently scheduled for May 27, 2015.

## SUMMARY OF ARGUMENT

1.     From the moment Salus filed the Complaint against the ABL Lenders, its strategy became clear:  to lie in wait for months while the Court entered order after order and then, on the eve of the sale hearing, file a "gotcha" lawsuit in an attempt to hold up the sale to Standard General L.P. ("Standard General") and strip the ABL Lenders of payments that were previously made to them and were court-approved.  Given the genesis of the Complaint, it should come as no surprise that it is devoid of merit.

---

[1] The ABL Lenders include (1) funds managed or advised by BlueCrest Capital Management (New York) LP, DW Partners, L.P., Macquarie Credit Investment Management Inc., Mudrick Capital Management, LP, Saba Capital Management, L.P., T. Rowe Price Associates, Inc. and Taconic Capital Advisors L.P. (collectively, the "First Out Lenders"); and (2) two affiliates of Standard General L.P., General Retail Holdings L.P. and General Retail Funding LLC.  Another Standard General L.P. affiliate, General Wireless Inc., was also named as a defendant in the Complaint, along with two other entities, Litespeed Master Fund, Ltd. and Litespeed Management LLC. Plaintiff appears to have improperly named Standard Wireless Inc., as defendants do not believe that this entity exists.

[2] The SCP Lenders include Salus Capital Partners, LLC; Salus CLO 2012-1, Ltd.; Cerberus Levered Loan Opportunities Fund II, LP; Cerberus NJ Credit Opportunities Fund, L.P. and Cerberus ASRS Holdings LLC. Compl. ¶ 20.

2.      At its core, the Complaint alleges that an intercreditor agreement to allocate the lien priority rights of the SCP Lenders and the ABL Lenders (the "<u>Intercreditor Agreement</u>")[3] somehow subordinated the ABL Lenders' right to receive routine loan payments from RadioShack—*i.e.*, payments not arising from the exercise of remedies against collateral ("<u>Routine Payments</u>").  Selectively quoting from the Intercreditor Agreement, Salus claims that when RadioShack entered into the October 2014 refinancing transaction, the relabeling of its outstanding, previously-funded and unarguably senior loan amounts from "Revolving Loans" into "Term Out Revolving Loans" suddenly meant that the loans no longer fit within the "Maximum ABL Facility Amount" defined in the Intercreditor Agreement.  According to Salus, this label change caused the ABL Lenders to lose senior status with respect to RadioShack's repayments of these loans, notwithstanding the fact that the SCP Lenders' rights were completely unaffected by the refinancing.  Salus is wrong—and the Complaint should be dismissed—for at least four reasons.

3.      *First*, the Intercreditor Agreement contains no provision subordinating Routine Payments in any circumstance.  In fact, the agreement unambiguously provides that the ABL Lenders have an absolute right to retain these payments and they cannot be disgorged for any reason.  This is consistent with New York law, which governs the agreement and rejects disgorgement as a remedy for breach of contract claims.

4.      *Second*, even if Salus could convince the Court that the Intercreditor Agreement somehow limited the ABL Lenders' rights to receive and retain Routine Payments only up to the Maximum ABL Facility Amount, no change to the Maximum ABL Facility Amount resulted

---

[3] Intercreditor Agreement dated Dec. 10, 2013.  *See* Declaration of Elliot Moskowitz dated May 1, 2015 ("<u>Moskowitz Decl.</u>") Ex. A.

from the re-definition of revolving loans as Term Out Revolving Loans—a conversion that was

expressly permitted under the Intercreditor Agreement, and that could not implicate the

Maximum ABL Facility Amount because no new loans were made as a result of the conversion.

And even if the conversion could reduce the Maximum ABL Facility Amount, Salus has not

alleged a reduction significant enough to affect Salus's rights even under Salus's own view of

the documents.  In short, Salus does not allege how its contractual rights could have been

implicated at all by a change in loan form that did not affect Salus's credit exposure in any way,

and was done only so the loans could be purchased by investors in the secondary market.

     5.    *Third*, Salus's claims are independently barred on the equitable ground of waiver.

Indeed, Salus's tactical decision to delay filing the Complaint until the eve of the bidding and

sale process, when it had been fully aware of the basis for these claims for months prior, is a

classic example of waiver and is another basis for dismissal.

     6.    *Finally*, Salus's claims other than its disgorgement claim are moot because such

claims seek to subordinate ABL Lender claims against the Debtors for principal and interest—

claims that have already been paid in full pursuant to the Court's Sale Order.

     7.    For all of these reasons, Salus's Complaint—which never should have been

brought in the first place—should be dismissed with prejudice.

## STATEMENT OF FACTS

**I.    Salus's Factual Allegations[4]**

The SCP Lenders entered into a lending agreement with RadioShack on December 10,

2013, agreeing to provide a $250 million term loan secured by (1) a first-priority lien on

---

[4] The facts set forth in this section are taken from the Complaint, and are assumed to be true for the purposes of a motion to dismiss.

RadioShack's fixed assets, intellectual property and equity interests of RadioShack subsidiaries; and (2) a second-priority lien on certain liquid assets of RadioShack, which Salus refers to in the Complaint as the "Liquid Collateral," Compl. ¶¶ 20-21, but which is defined under the Intercreditor Agreement as the "ABL Priority Collateral," *see* Moskowitz Decl. Ex. A, Intercreditor Agreement § 1.2 (defining "ABL Priority Collateral" to include, *inter alia*, RadioShack's cash, bank accounts, deposits, receivables and inventory).

That same day, a group of lenders (the "Original ABL Lenders") led by General Electric Capital Corp. (the "Original ABL Agent") entered into an agreement to provide a $535 million revolving asset-based credit facility and a $50 million asset-backed term loan.[5]  Compl. ¶¶ 24-25; *see* Moskowitz Decl. Ex. B, ABL Credit Agreement dated Dec. 10, 2013 (the "Original ABL Credit Agreement").  Both the revolving credit facility and the term loan were secured by a first-priority lien on the Liquid Collateral (*i.e.*, the ABL Priority Collateral) and a second-priority lien on RadioShack's fixed assets, intellectual property and subsidiaries' equity interests.  Compl. ¶ 26.  In Section 1.1(b) of the Original ABL Credit Agreement, the $535 million revolving facility was referred to as the "Revolving Loan Commitments," which was defined broadly to include any "Loan" provided by any of the "Revolving Lenders" who were listed in Schedule 1.1(b).

To govern the rights and priorities of the SCP Lenders and the Original ABL Lenders with respect to the collateral securing each facility, the SCP Agent and the Original ABL Agent entered into the Intercreditor Agreement.  Compl. ¶ 27.

On October 3, 2014, the Original ABL Lenders sold all of their interests under the Original ABL Credit Agreement to two affiliates of Standard General, General Retail Holdings L.P. ("GRH") and General Retail Funding LLC. ("GRF").  Compl. ¶¶ 31-32.  Also on October 3,

---

[5] According to Salus's Complaint, the $50 million term loan is not relevant to its claims. Compl. ¶ 38 n.4.

RadioShack entered into an amendment to the Original ABL Credit Agreement with GRH, GRF, and Cantor Fitzgerald Securities LLC, in its capacity as the successor administrative agent for the ABL Lenders (the "ABL Agent").  Compl. ¶ 33; Moskowitz Decl. Ex. C, First Amendment to Credit Agreement dated Oct. 3, 2014 (the "First Amendment").  The First Amendment provided for the conversion of the $535 million in outstanding revolving loans into (1) a loan facility in an aggregate principal amount of $275 million (the "Term Out Revolving Loans"), (2) a letter of credit facility in an aggregate principal amount of $120 million (the "LC Facility"), and (3) a revolving loan facility in an aggregate principal amount of up to $140 million (the "Effective Date Revolving Commitments") (collectively, the "Amended ABL Loans").  Id.  As such, the First Amendment did not change the amount outstanding under the Original ABL Credit Agreement, which remained $535 million.

Annex 1 to the First Amendment (the "Amended ABL Credit Agreement") provides the specific line edits to the Original ABL Credit Agreement that implemented the terms of the First Amendment.  Among those edits, the Amended ABL Credit Agreement redefined "Revolving Loan Commitments" to consist of the Term Out Revolving Loans, the LC Facility, and the Effective Date Revolving Commitments.  Amended ABL Credit Agreement § 11.1.
Shortly after the execution of the First Amendment, funds affiliated with the First Out Lenders acquired participating interests in the Amended ABL Loans.[6]  Compl. ¶ 32.  The Amended ABL Loans held by the First Out Lenders are subject to the Intercreditor Agreement.  Id. ¶¶ 34, 39, 50, 60, 65 and 74.

---

[6] Certain entities who were named as defendants in the Adversary Complaint were not the legal entities that invested in the ABL Loans, and therefore were not the recipients of the Routine Payments.  These entities have no payments to disgorge.

## II.      The Intercreditor Agreement

The Intercreditor Agreement addresses the rights of the respective creditor groups as to the collateral securing the loans. *See* Intercreditor Agreement Preamble, Fourth (providing that the Intercreditor Agreement is to "set forth, among other things, their agreement as to certain of their respective rights and obligations with respect to the assets and properties of the Credit Parties"). To this end, Section 2.1(a) of the Intercreditor Agreement provides that the ABL Lenders' loans are secured by liens on the ABL Priority Collateral that are senior to the liens of the SCP Lenders on the same collateral. Specifically, Section 2.1, titled "Priority of Liens," provides:

> Notwithstanding the date, manner or order of grant, attachment or perfection of any Junior Lien in respect of any collateral and notwithstanding any provision of the UCC, any applicable law or any Collateral Document, the Junior Agent, on behalf of each Junior Secured Party, in respect of such Collateral hereby agrees that:  (a) any Senior Lien in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be and shall remain senior and prior to any Junior Lien in respect of such Collateral[.]

Thus, under Section 2.1(a), any Senior Lien in respect of any Collateral "shall be and shall remain senior to any Junior Lien in respect of such Collateral," without exception.

The definitions of the Intercreditor Agreement provide that the ABL Lenders were granted these "Senior Liens" on the ABL Priority Collateral with respect to all $535 million of their lending commitments.  "Senior Lien" is defined to include, "with respect to ABL Priority Collateral, all Liens securing Senior ABL Claims[.]"  Intercreditor Agreement § 1.2.  In turn, "Senior ABL Claims" include, "with respect to any ABL Priority Collateral, all ABL Claims other than Excluded ABL Claims," with "ABL Claims" broadly defined to include "any and all liabilities and indebtedness, however evidenced, of every kind, nature and description owing by any Credit Party to the ABL Agent and any of the [ABL Lenders]" arising from the ABL

Lenders' loans to RadioShack.  *Id.*  The "Excluded ABL Claims"—the only claims of the ABL Lenders that are not entitled to senior collateral priority over the collateral priority afforded to SCP Lenders' claims—are "ABL Claims constituting the aggregate outstanding principal amount of loans and outstanding amount of Letters of Credit made, issued or incurred pursuant to the ABL Loan Documents in excess of the Maximum ABL Facility Amount at the time of such making, issuance or occurrence[.]"  *Id.*

In other words, the ABL Lenders were granted liens that are senior to the liens of the SCP Lenders on all ABL Priority Collateral for the aggregate principal amount of the ABL Lenders' loans to RadioShack, up to the "Maximum ABL Facility Amount."  "Maximum ABL Facility Amount" is defined in the Intercreditor Agreement, in pertinent part, as (1) the "Aggregate Revolving Loan Commitments [as defined in the Original ABL Credit Agreement] minus any permanent reductions in the Revolving Loan Commitments [as defined in the Original ABL Credit Agreement]."  § 1.2.  "Aggregate Revolving Loan Commitments" is defined in the Original ABL Credit Agreement as the sum of all "Revolving Loan Commitments."  Original ABL Credit Agreement § 11.1.  Thus, all of the ABL Lenders' "Revolving Loan Commitments" are protected by senior liens on the ABL Priority Collateral.

Section 9.1(a) of the Intercreditor Agreement provides that, as a general rule, the ABL Lenders are permitted to amend "any or all of the ABL Loan Documents," including the Original ABL Credit Agreement, "at any time and from time to time and without consent of or notice to any SCP Secured Party, without incurring any liability to any [SCP Lenders]."  Although the Intercreditor Agreement provides that certain terms and definitions of the ABL Credit Agreement require the SCP Lenders' consent before they can be amended, the definition of

"Revolving Loan Commitment" is not one of these exceptions.  *See* Intercreditor Agreement

§ 9.1(a)(ii) (listing definitions that cannot be amended without the SCP Lenders' consent).

The Intercreditor Agreement contains no provision subordinating the ABL Lenders' right

to receive repayments of amounts owing to them under the Amended ABL Credit Agreement

outside the context of a Collateral Enforcement Action.[7]  To the contrary, Section 11.7 provides

that the Intercreditor Agreement cannot be the basis for subordinating the ABL Lenders' right to

receive loan payments from RadioShack:

> Nothing in this Agreement shall be deemed to subordinate the obligations due to
> (i) any ABL Secured Party to the obligations due to any SCP Secured Party or (ii)
> any SCP Secured Party to the obligations due to any ABL Secured Party (in each
> case, whether before or after the occurrence of an Insolvency Proceeding), it
> being the intent of the parties that this Agreement shall effectuate a subordination
> of Liens but not a subordination of Indebtedness.

Consistent with this provision, the SCP Agent, on behalf of the SCP Lenders, expressly

acknowledged in the Intercreditor Agreement that "in the ordinary course of business the ABL

Agent and the ABL Lenders will apply payments . . . thereunder," and that "all ABL Priority

Collateral received by the ABL Agent may be applied . . . in whole or in part, to the ABL Claims

at any time." §§ 4.7(i), 4.7(iii).  Moreover, the agreement provides that once such payments have

been made to the ABL Agent, the agent is "permitted to deem all collections and payments

deposited in any bank accounts, deposit account  . . . or the Agent's Account to be proceeds of

ABL Priority Collateral and no such funds credited to the Agent's Account shall be subject to

disgorgement[.]"  § 4.4(a)(ii).

A different provision, Section 4.1, governs proceeds received by the ABL Agent in

connection with a Collateral Enforcement Action.  *See* § 4.7 (noting that Section 4.7 applies

---

[7] As set forth above, this brief refers to such payments as "Routine Payments."

"except as provided in Section 4.1"); § 4.1 (applying to "[p]roceeds of ABL Priority Collateral received by either Agent or any Secured Party in connection with a Collateral Enforcement Action"). A "Collateral Enforcement Action" is defined to include "any exercise of any secured creditor rights or remedies . . . with respect to any Collateral," as well as the commencement of insolvency proceedings and other proceedings to realize upon any lien or upon the RadioShack Collateral. *Id.* § 1.2. Section 4.1, the only instance in the Intercreditor Agreement where the priority of payment for the ABL Priority Collateral is addressed, provides for a waterfall of priorities to pay the respective creditors: "first, to the payment of the Senior ABL Claims . . .[,] Asserted Indemnification Claims and any other contingent Senior ABL Claims . . . , second to the payment of Senior SCP Claims, third to the payment of any Excluded ABL Claims, and fourth to the payment of any Excluded SCP Claims."

The Intercreditor Agreement is governed by New York law. § 12.7.

### III.    Salus's Claims

The crux of Salus's Complaint is that Section 2.1(a) of the Intercreditor Agreement not only limited the ABL Lenders' senior liens to the aggregate principal amount of the Revolving Loan Commitments, but also limited the ABL Lenders' rights to receive Routine Payments by RadioShack following the execution of the First Amendment. Compl. ¶ 39. The Complaint alleges that the $275 million in Term Out Revolving Loans did not qualify as "Revolving Loan Commitments" as the term was defined in the Original ABL Credit Agreement, and that the First Amendment therefore effectively reduced the "Maximum ABL Facility Amount" under the Intercreditor Agreement by that same amount, to $260 million. *Id.* ¶¶ 37-38, 44-48.

Because Salus has interpreted Section 2.1(a) of the Intercreditor Agreement to cover Routine Payments—and not just the priority of liens—Salus claims that all Routine Payments that RadioShack had made on outstanding Term Out Revolving Loans should have been

subordinated to the SCP Lenders' own loan repayments. *Id.* ¶ 39. Salus alleges that of the $232 million in funded Term Out Revolving Loan Commitments that were outstanding as of the October 2014 Transaction, the ABL Lenders have received $129 million in repayments on those loans. Salus claims that this $129 million should have been paid to Salus, and should be disgorged. *Id.*

In addition to its disgorgement claim, Salus raises three other claims.[8]  The First and Third counts of the Complaint each seek a declaratory judgment to limit the total value of the ABL Lenders' claims that are senior to the SCP Lenders' claims in the bankruptcy proceedings. The Fifth count similarly alleges that the ABL Lenders continue to breach the Intercreditor Agreement by asserting priority over the SCP Term Loan with respect to the ABL Priority Collateral, and seeks specific performance under the Intercreditor Agreement. For the reasons discussed in Section V below, each of these three counts have been rendered moot by the Court's Sale Order (the "Sale Order"),[9] in which the Court, after four days of sale hearings and testimony from numerous witnesses, allowed General Wireless Inc. ("General Wireless"), an affiliate of Standard General, to credit bid its debt on the ABL Priority Collateral and, as a result, the ABL Lenders' senior claims for principal and interest were paid in full.[10]

---

[8] A fifth claim (the Second Cause of Action), seeking a declaratory judgment regarding the maximum amount that the ABL Lenders are entitled to credit bid, was released under the Sale Order. *See* Sale Order dated Apr. 3, 2015 ¶ 44.

[9] Order Authorizing (I) The Sale of Certain Assets of the Debtors Free and Clear of All Claims, Liens, Liabilities, Rights, Interests and Encumbrances; (II) The Debtors to Enter Into and Perform Their Obligations Under the Asset Purchase Agreement and Certain Ancillary Agreements; (III) the Debtors to Assume and Assign Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [D.I. 1672], April 1, 2015.

[10] The First Out Lenders still have contingent claims, including indemnification claims, but those Senior ABL Claims are not relevant to this Adversary Proceeding.

## **LEGAL STANDARD**

In resolving a motion to dismiss, the Court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).   In particular, "[t]he determination of the existence of ambiguity in a contract and the interpretation of a clear and unambiguous contract are both appropriate questions of law for a court to decide when adjudicating a motion to dismiss." *In re Premier Int'l Holdings, Inc.*, 443 B.R. 320, 333 (Bankr. D. Del. 2010).  The Court therefore need not defer to Salus's legal conclusions as to what the Intercreditor Agreement means. *See id.* at 329 n.47 ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (quotations and citation omitted)); *In re SHC, Inc.*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) ("If the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." (quotation marks and citation omitted)).

Moreover, the Court may examine the Intercreditor Agreement and other relevant contracts in whole to fully ascertain their meaning, and not just the select provisions that Salus has misleadingly cited in its Complaint. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999) ("[A] district court may examine an 'undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" (citation omitted)); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (undertaking an independent review of the contract attached to the defendant's motion to dismiss because the "complaint is based on this contract" and "[o]therwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied").

In addition, courts applying New York law, which governs the Intercreditor Agreement, must construe a contract "so as to give full meaning and effect to all of its provisions." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (quoting *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (1st Dep't 1990)); *see also Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

## **ARGUMENT**

### I.    **The Intercreditor Agreement Unambiguously Protects The ABL Lenders' Rights To Receive And Retain Routine Payments From RadioShack**

The Intercreditor Agreement does not provide for the subordination of Routine Payments by RadioShack to its lenders under any circumstances, and instead specifically provides that Routine Payments are never subject to disgorgement.

### A.    **The Intercreditor Agreement Does Not Subordinate The ABL Lenders' Right To Receive Routine Payments Under Any Circumstances**

The Intercreditor Agreement does not provide for the subordination of Routine Payments. In fact, the Intercreditor Agreement expressly provides that it ***cannot*** be used as a basis to subordinate the ABL Lenders' right to receive Routine Payments:  "Nothing in this Agreement shall be deemed to subordinate the obligations due to . . . any ABL Secured Party to the obligations due to any SCP Secured Party, . . . it being the intent of the parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness." § 11.7.  Moreover, Section 11.7 by its term applies not only to Routine Payments, but also to ABL Claims on all outstanding obligations, "whether before or after the occurrence of an Insolvency Proceeding[.]"  *Id.*  Thus, the Intercreditor Agreement unambiguously bars Salus from claiming that the Intercreditor Agreement subordinated either the ABL Lenders' Routine Payments or their post-petition Senior ABL Claims.

12

Further, while Salus claims that the ABL Lenders' loans exceeded the "Maximum ABL Facility Amount" set forth in Section 2.1(a) of the Intercreditor Agreement, the fact is that Section 2.1(a) has nothing to do with Routine Payments or debt subordination.  Section 2.1(a) provides, in substance, that the ABL Lenders have Senior Liens on ABL Priority Collateral, except with respect to Excluded ABL Claims—*i.e.*, claims in excess of the Maximum ABL Facility Amount.  This provision plainly relates to the relative priority of liens, not to the subordination of Routine Payments as Salus suggests.

The two other sections of the Intercreditor Agreement that contain references to "Maximum ABL Facility Amount"—Section 4.1 and Section 5—likewise have nothing to do with Routine Payments.  Just as Section 2.1(a) limits the ABL Lenders' Senior Liens to loans up to the Maximum ABL Facility Amount, Section 4.1 of the Intercreditor Agreement determines the waterfall application of proceeds of ABL Priority Collateral in connection with any "Collateral Enforcement Action" by a secured creditor to exercise remedies against RadioShack's collateral.  According to the Collateral Enforcement Action waterfall, the ABL Lenders have priority over the SCP Lenders up to the Maximum ABL Facility Amount.  *See* § 4.1 (providing that proceeds of ABL Priority Collateral received by the ABL Agent in connection with a Collateral Enforcement Action must be applied first to, *inter alia*, "Senior ABL Claims," which exclude claims in excess of the Maximum ABL Facility Amount).  This provision has no application here because there had been no Collateral Enforcement Action at the time the Routine Payments were made.  The only other reference to "Maximum ABL Facility Amount" in the Intercreditor Agreement is in Section 5, which addresses post-petition financing and likewise has nothing to do with Routine Payments.  *See* § 5.3(a)(iv) (providing that the SCP

Lenders cannot object to a motion or debtor-in-possession financing, so long as the aggregate

principal and interest on all ABL Claims do not exceed the Maximum ABL Facility Amount).

Thus, neither Section 2.1(a), nor any other provision of the Intercreditor Agreement,

applies the Maximum ABL Facility Amount to somehow restrict the ABL Lenders' entitlement

to receive and retain Routine Payments, as Salus incorrectly contends.

**B.    Under The Intercreditor Agreement The ABL Lenders Are Entitled To Retain All Routine Payments, Which Cannot Be Disgorged**

The provisions of the Intercreditor Agreement that *do* address Routine Payments

unambiguously protect them from disgorgement.

Section 4—not section 2—of the Intercreditor Agreement addresses Routine Payments to

the ABL Lenders.  Under Section 4.4(a)(ii), the ABL Agent has complete discretion to deem any

"payments" that it receives to be "proceeds of ABL Priority Collateral," after which time "no

such funds credited to the Agent's Account shall be subject to disgorgement[.]"

Furthermore, Salus expressly acknowledged that "all ABL Priority Collateral received by

the ABL Agent may be applied, reversed, reapplied, credited or reborrowed, in whole or in part,

to the ABL Claims at any time."  Intercreditor Agreement § 4.7(iii).  Because this provision

allows the ABL Agent at any time to apply all ABL Priority Collateral to ***ABL Claims***—which

by definition ***include*** "Excluded ABL Claims"—the ABL Lenders' rights to receive such

payments is plainly not restricted in any way by the Maximum ABL Facility Amount.  And in

contrast to Section 4.1, the acknowledged right of the ABL Agent to apply all received payments

applies to payments in the ordinary course.  *See, e.g.*, *id.* § 4.7(i) (providing that the SCP Lenders

acknowledge the right of the ABL Agent and ABL Lenders to apply payments "in the ordinary

course of business").

14

The only exception to this rule, set out in Section 4.4(b), is when the ABL Agent mistakenly receives "proceeds of SCP Collateral." In that event, the SCP Lenders must send a "Misdirected Cash Proceeds Notice" to the ABL Agent within 30 days of the ABL Agent's receipt of the proceeds. *Id.* § 4.4(b). Yet even upon receiving such a notice, the proceeds still may not be disgorged; instead, the remedy is for the ABL Agent to "turn over to the SCP Agent from the next proceeds of ABL Collateral received by the ABL Agent an amount equal to" the mistakenly diverted SCP Collateral proceeds. *Id.* Of course, Salus does not claim to have issued such a request with respect to the $129 million in loan payments that it now seeks disgorged— and it would have had no basis to do so. Routine Payments to the ABL Lenders are not the same thing as "proceeds of SCP Collateral," nor has Salus alleged otherwise. Salus's claim for disgorgement is thus meritless.[11]

### C.    Disgorgement Is Also Unavailable For Salus's Breach of Contract Claim Under New York Law

Salus's disgorgement claim fails not only under the Intercreditor Agreement but also under well-established principles of contract law. Disgorgement is an ***equitable*** remedy that courts have held unavailable for breach of contract claims because such a remedy improperly

---

[11] These provisions in Section 4 are completely consistent with, and supported by, creditors' rights to routine loan payments under the Uniform Commercial Code. Under U.C.C. § 9-332(a), "a transferee of money takes the money free of a security interest unless the transferee acts in collusion with the debtor in violating the rights of the secured party." Courts applying U.C.C. § 9-332, including New York courts, routinely rule in favor of creditors who have received payments owed to them, absent any collusion. *See, e.g., Gladstein v. Martorella*, 75 A.D. 3d 465, 467 (N.Y. Ct. App. 1st Dep't 2010) (assignee of mortgage secured by insurance proceeds no longer maintained security interest because "the debtor . . . was no longer in possession of the proceeds" and "there [was] no record indication of any collusion by plaintiff"); *Square Mile Structured Debt (one) LLC v. Swig*, Nos. 603825/08, 600613/10, 2010 WL 4167253, at *5 (N.Y. Sup. Ct. Oct. 15, 2010) ("[A]s a transferee in the context of UCC section 9-332, Square Mile takes these cash proceeds free of any security interest."); *see also Gen. Elec. Capital Corp. v. Union Planters Bank, N.A.*, 409 F.3d 1049, 1058 (8th Cir. 2005) (holding that even "a junior secured creditor that knows of its junior status can be paid in the ordinary course of business"); *Orix Credit Alliance, Inc. v. Sovran Bank, N.A.*, 4 F.3d 1262, 1266 (4th Cir. 1993) (debtor's payments from cash collateral account to reduce junior creditor's line of credit in the ordinary course of business did not carry with it senior creditor's security interest in the cash collateral). Certainly, Salus has not alleged collusion between the ABL Lenders and RadioShack to defraud the SCP Lenders, nor could it. *See Amegy Bank Nat'l Ass'n v. Deutsche Bank Corp.*, 917 F. Supp. 2d 1228, 1239 (M.D. Fla. 2013) (noting that the burden is on the claimant to show that "the transferee was affirmatively engaged in wrongful conduct" (internal quotation marks omitted)).

focuses on the defendant's ill-gotten gains, rather than the plaintiff's losses.  *See, e.g.*, *Franconero v. Universal Music Corp.*, No. 02 Civ. 1963 (BSJ), 2011 WL 566794, at *4 (S.D.N.Y. Feb. 11, 2011) ("It is well-settled that [d]isgorgement . . . is not an appropriate remedy for a breach of contract because [d]isgorgement looks to the defendant's ill-gotten gains, rather than to the plaintiff's losses." (internal quotation marks omitted)); *Pot Luck, LLC v. Freeman*, No. 06 Civ. 10195 (DAB), 2010 WL 908475, at *2 (S.D.N.Y. Mar. 8, 2010) ("Plaintiffs rightly do not contest Defendants' contention that  disgorgement of profits is unavailable under New York contract law."); *Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 269 (S.D.N.Y. 2005) ("Disgorgement of profits is not an appropriate remedy for a breach of contract.").

In addition, Salus has failed to allege that it suffered any damage as a result of the alleged breach.  Salus alleges only that the SCP Lenders lent $250 million to RadioShack on December 10, 2013—almost ten months prior to the First Amendment—and that "[s]ubstantially all of the principal balance remains outstanding."  Compl. ¶ 23.  But Salus does not allege that at the time the loan payments were made to the ABL Lenders, payments were also due and owing to the SCP Lenders, or that the payments received by the ABL Lenders in any way came at the expense of RadioShack payments to the SCP Lenders.  Because Salus has failed to allege what losses it suffered as a result of the ABL Lenders' alleged breach, Salus has no claims for damages under any recognized breach of contract theory.

## II.    The First Amendment Did Not Reduce The Maximum ABL Facility Amount Or Otherwise Affect Salus's Credit Exposure In Any Way

Even if Salus were correct (which it is not) that the Maximum ABL Facility Amount had some bearing on the ABL Lenders' rights to receive Routine Payments from RadioShack, Salus's allegation that the First Amendment reduced the Maximum ABL Facility Amount by converting a portion of the Aggregate Revolving Loan Commitments into Term Out Revolving

Loans is meritless under the plain terms of the First Amendment for at least four reasons. First, the ABL Lenders did not reduce the Maximum ABL Facility Amount by executing the First Amendment. Second, the amendments to the ABL Credit Agreement that underpin Salus's arguments were expressly permitted under the Intercreditor Agreement, and therefore could not by themselves have constituted a breach of the Intercreditor Agreement. Third, even if the First Amendment could somehow be read to reduce the Maximum ABL Facility Amount and thereby reduce the amount of Routine Payments to which the ABL Lenders were entitled, Salus has failed to allege that the Routine Payments at issue here exceeded what Salus itself alleges to be the Maximum ABL Facility Amount. And fourth, the Maximum ABL Facility Amount is calculated at the time the ABL Lenders' loans are "made," and the Term Out Revolving Loans were indisputably revolving loans when they were made. Because the Intercreditor Agreement is unambiguous in these respects, the Court should determine that all of Salus's claims lack merit and should be dismissed.

### A.    The First Amendment Did Not Reduce The Maximum ABL Facility Amount

The Maximum ABL Facility Amount remained the same following the First Amendment, as did the economics of the ABL Lenders' commitments, and thus no contractual expectation of the SCP Lenders was or could have been impacted by the First Amendment.

"Maximum ABL Facility Amount" is defined in the Intercreditor Agreement, in pertinent part, as the "Aggregate Revolving Loan Commitments [as defined in the ABL Credit Agreement] minus any permanent reductions in the Revolving Loan Commitments [as defined in the ABL Credit Agreement]." *See* Intercreditor Agreement § 1.2. The Aggregate Revolving Loan Commitments, defined in the Original ABL Credit Agreement as the sum of all Revolving Loan Commitments of the Lenders, expressly remained $535 million, unchanged, after the execution of the First Amendment. Amended ABL Credit Agreement § 11.1.

17

Contrary to Salus's interpretation, the Original ABL Credit Agreement did not define "Revolving Loan Commitment" in terms of the specific characteristics of loans made at the time of the agreement.  Rather, "Revolving Loan Commitment" was simply defined to include the $535 million of "Loans to the Borrower" made by any "Revolving Lender."  Original ABL Credit Agreement § 1.1(b)(i); Schedule 1.1(b).  "Revolving Lender" was also defined not by the type of loan the lender provided, but as any "Lender" with a "Revolving Loan Commitment." *Id.* § 11.1.  The Original ABL Credit Agreement protected any such Revolving Lender by providing that the entirety of the $535 million in loans would be subject to borrowing base testing at all times and subject to market standard mandatory paydown when outstanding ABL loans exceeded the borrowing base.  *See* Original ABL Credit Agreement § 1.1(b)(i) (providing that the aggregate principal amount of all outstanding loans cannot exceed a defined borrowing base at any given time).

Salus claims that the First Amendment reduced the Maximum ABL Facility Amount because under the Intercreditor Agreement, the Maximum ABL Facility Amount is limited to "Revolving Loan Commitments" as of the date of the Original ABL Credit Agreement.  But under the First Amendment, all $535 million in lending commitments continued to be provided by "Lenders" of "Revolving Loan Commitments."  Although the definition of "Revolving Loan Commitments" was amended to include Term Out Revolving Loans, "Revolving Loan Commitments" was still defined so as to include the entirety of the $535 million in lending commitments by the ABL Lenders.  *See* Amended ABL Credit Agreement § 1.1(b)(iv).

Salus's claim that the First Amendment reduced the Revolving Loan Commitments is nonsensical. The use of the term "Revolving Loan Commitments" in the Original ABL Credit Agreement reflected only the fact that at the time of the agreement, the lending commitments by

the ABL Lenders happened to be revolving loan facilities.  But nothing in the definition of "Revolving Loan Commitments" ***required*** that the loans be revolving, or subject to reborrowing. The Original ABL Credit Agreement even provided that the "Revolving Loan Commitments" could include Letters of Credit, underscoring the fact that the Maximum ABL Facility Amount was not limited to revolving loans.  *See* Original ABL Credit Agreement § 1.1(c) (contemplating Letter of Credit Obligations to be "covered by all Revolving Lenders").[12]

At bottom, the Term Out Revolving Loans provided the same basic economic risk profile and borrowing base protections as existed prior to the First Amendment.  Just like the revolving loans described in the Original ABL Credit Agreement, the Term Out Revolving Loans are asset-based, and subject to the same borrowing base as prior to the First Amendment.  *See* Amended ABL Credit Agreement § 1.1(b)(iv) (requiring all Loans to be immediately prepaid if "Availability" is ever less than zero); § 11.1 (defining "Availability" as the amount by which the borrowing base exceeds the aggregate principal balance of the outstanding Revolving Loan Commitments, including the Term Out Revolving Loans).  In addition, standard borrowing base reporting continued to be required, including delivery of weekly borrowing base certificates.  *See* Amended ABL Credit Agreement § 4.2(d).  Moreover, the First Amendment restored the Reserves and Availability Reserves, which were required to be maintained by the Intercreditor Agreement, to the original amounts put in place on the closing date of the Original ABL Credit Agreement—a level that was expressly permitted by the Intercreditor Agreement.  First Amendment § 6.

---

[12] To the extent that Salus is alleging that the revolving nature of the prior loans held some legal importance or implicated the rights of the SCP Lenders in some way, it is worth noting that the First Amendment provides that repaid or prepaid Term Out Revolving Loans can be reborrowed if the Term Out Lenders agree in a writing acknowledged by the Agent.  First Amendment § 2(c).

Thus, the change in the types of loans comprising the Revolving Loan Commitments had no impact on the size of the loans or the borrowing base protections.  It also had no impact on Salus's risk exposure, or any other aspect of Salus's loans to RadioShack.  Salus has offered no rationale for how it could have been harmed by a definitional change that did not affect the economics of the ABL Lenders' commitments, nor could it.

### B.    The Intercreditor Agreement Expressly Permits the Amendments To Which Salus Now Objects

Salus's Complaint additionally fails as a matter of law because the amendments to the ABL Credit Agreement upon which Salus's claims are based were expressly permitted by the Intercreditor Agreement.  Under Section 9.1(a), the ABL Lenders are entitled to amend "any or all of the ABL Loan Documents," including the ABL Credit Agreement, "at any time and from time to time and without consent of or notice to any SCP Secured Party, without incurring any liability to any SCP Secured Party[.]"  Section 9.1(a) then sets out a limited list of exceptions to this rule, including, *inter alia*, changes to the interest rate, § 9.1(a)(i); requiring mandatory prepayments or additional payments that are not provided for in the ABL Loan Documents, § 9.1(a)(v); and additional restrictions on RadioShack's payments to the SCP Lenders, § 9.1(a)(vi).  The reason for these exceptions is self-evident: any of these amendments could affect Salus's own credit risk as a subordinated lender to RadioShack.

Additionally—and fatal to Salus's claims—Section 9.1(a)(ii) lists six definitions (including component definitions) that cannot be amended without Salus's consent.  The definition of "Revolving Loan Commitments"—the amendment that Salus alleges led to the breach of the Intercreditor Agreement—is notably absent from the list.  *See* § 9.1(a)(ii).  Nor is the defined term "Revolving Loan Commitments" used as part of any of the six definitions on this list. *Id.*  And its absence from the list makes sense, because converting $535 million of asset-

backed Revolving Loan Commitments that are subject to a borrowing base into other types of lending commitments that also total $535 million, are asset-backed, and are also subject to a borrowing base, does not in any way affect the SCP Lenders' credit exposure, or their rights vis-à-vis the ABL Lenders or RadioShack.  Further, even for the definitions whose amendments are subject to the SCP Lenders' consent, the ABL Lenders may still unilaterally amend those terms, so long as they are not amended "in a manner that would make more credit available to the Borrower." § 9.1(a)(ii).  Salus has not claimed, and cannot claim, that the amendment of the definition of Revolving Loan Commitments made more credit available to RadioShack.

The Intercreditor Agreement also expressly permits a refinancing of the ABL Loans without the SCP Lenders' consent so long as the terms of the refinancing do not include changes to the six definitions that require the SCP Lenders' permission to amend—which they did not. § 4.8.

In sum, because the First Amendment did not modify any of the terms listed in Section 9.1(a)(ii), Salus's breach of contract claims based solely on the execution of the First Amendment must fail.  If Salus had any reason to be concerned about a change in the *type* of loan provided in a refinance, it could have negotiated for the right to be consulted about such an amendment under Section 9.1(a)(ii) of the Intercreditor Agreement.

### C.    Salus's Claims Additionally Fail Because Salus Concedes That The Loans Were Already Outstanding At The Time Of The First Amendment

Salus's claims all fail for an additional reason:  Salus does not dispute that the Term Out Revolving Loans were already outstanding at the time of the First Amendment.

Under the Intercreditor Agreement, the ABL Lenders' claims do not lose their senior priority over SCP Lender claims as "Excluded ABL Claims" unless they arise from loans exceeding the Maximum ABL Facility Amount "at the time of such making, issuance or

incurrence[.]"  § 1.2.  But Salus admits that "the First Amendment converted $275 million of what previously had been available for revolving loans . . . into term loans . . . of which, *at the time of the amendment, approximately $232 million in borrowings were then outstanding* [.]" Compl. ¶ 33(ii) (emphasis added).  Because Salus concedes that all of the Routine Payments and Senior ABL Claims that it seeks to subordinate relate to loans that were already outstanding (*i.e.*, previously incurred) as of the First Amendment, Salus cannot argue that any reduction in the Maximum ABL Facility Amount affects the status of those loans under the Intercreditor Agreement.  Salus's claims therefore fail even if Salus is correct that the Maximum ABL Facility Amount applies prior to a Collateral Enforcement Action and does not include Term Out Revolving Loans.

> **D.    Even Assuming The First Amendment Reduced the Maximum ABL Facility Amount to $260 Million, That Reduction Would Be Insufficient To Trigger Any Obligation To Pay The SCP Lenders**

Even if Salus were somehow able to prevail on its interpretation of the Intercreditor Agreement, Salus still has failed to adequately allege that the $129 million in loan payments made to the ABL Lenders—or, for that matter, the $103 million that was still allegedly owed to the ABL Lenders at the time the Complaint was filed—belong to Salus rather than to the ABL Lenders.

The Complaint alleges that the First Amendment reduced the Maximum ABL Facility Amount to $260 million.  But the Complaint also alleges that $129 million in loan payments made to the ABL Lenders, and another $103 million in ABL Lender senior secured claims arising from RadioShack loan obligations, should have been paid to Salus.  *See* Compl. ¶ 39. Thus, Salus has alleged only $232 million in payments and claims held by the ABL Lenders— less than even Salus's view of the Maximum ABL Facility Amount, which would be $260 million.

Salus alleges that as a result of this reduction in the Maximum ABL Facility Amount, "the Term Out [Revolving Loans] are subordinated to the SCP Term Loan with respect to the Liquid Collateral," Compl. ¶ 37, but this is a legal conclusion that misreads the plain meaning of the Intercreditor Agreement.  Under the agreement, "Excluded ABL Claims"—i.e., claims not entitled to senior status, are, in relevant part, "ABL Claims constituting (a) *the aggregate* outstanding principal amount of loans and outstanding Letters of Credit made, issued or incurred pursuant to the ABL Loan Documents *in excess of the Maximum ABL Facility Amount[.]*" § 1.2 (emphasis added).  In other words, even if the Maximum ABL Facility Amount had been reduced to $260 million as Salus contends—and even if the Maximum ABL Facility Amount bears any relevance to Routine Payments, which it does not—the ABL Lenders would still be entitled to senior priority for all payments up to $260 million, and were allegedly only paid or owed $232 million.  Because Salus has not alleged any rationale for why those payments should have been diverted to the SCP Lenders, Salus claims fail for this reason as well.

### III.    Salus Waived Its Claims By Tactically Waiting to File The Complaint

The conspicuous absence of contractual support for Salus's claims is indicative of the fact that the true aim of the Complaint was to generate last-minute bargaining leverage in connection with General Wireless's credit bid.  Although Salus's attempt failed, this Court should still consider the genesis and timing of the Complaint, which Salus obviously delayed in bringing for strategic reasons, as an alternative basis to dismiss Salus's claims with prejudice.[13]

Salus had been aware of the alleged basis for its claims against the ABL Lenders for months prior to commencing the adversary proceeding the week prior to the sale hearing.  Yet

---

[13] This Court may consider Salus's conduct in these bankruptcy proceedings in ruling on this motion to dismiss.  *Diceon Elec., Inc. v. Calvary Partners, L.P.*, 772 F. Supp. 859, 861 (D. Del. 1991) ("On a motion to dismiss the Court is free to take judicial notice of certain facts that are of public record if they are provided to the Court by the party seeking to have them considered.").

from the commencement of these bankruptcy proceedings, the SCP Lenders chose to remain

silent, declining multiple opportunities to assert their purported rights.  The DIP financing plan

that came before this Court in February included the dollar-for-dollar roll-up and repayment of

outstanding debts owed to the ABL Lenders—including obligations that Salus now claims

should be subordinated to the SCP Lenders.  Yet Salus made no mention of this issue, ultimately

supporting the DIP financing plan.  *See* Final DIP Order [D.I. 947], Mar. 12, 2015, ¶ 1.4; DIP

Financing Support Agreement dated Feb. 5, 2015.

Then came the Debtors' motion to approve bidding procedures, including General

Wireless's right to credit bid.  Again, the SCP Lenders did not include their allegedly senior

rights under the Intercreditor Agreement among their numerous objections prior to agreeing to

settle those objections and pave the way for the Court to approve the bidding procedures. *See*

Joint Objection of SCP Lenders, No. 15-10197, D.I. 387 (Bankr. D. Del. Feb. 19, 2015);

Debtors' Consolidated Reply to Objections to Bidding Procedures Motion, No. 15-10197, D.I.

509, at 1 n.3 (Bankr. D. Del. Feb. 23, 2015); Debtors' Combined Motion for Entry of Order

Establishing Bidding and Sale Procedures, No. 15-10197, D.I. 36  (Bankr. D. Del. Feb. 5, 2015).

Only on the eve of the Debtors' sale hearing did Salus unveil its meritless claims against

Standard General and the First Out ABL Lenders—along with a companion motion to preclude

the General Wireless credit bid—claiming the subordination of Senior ABL Claims that had

already been discharged by the DIP Final Order and seeking to disgorge $129 million in Routine

Payments arising from the same obligations.

This Court should not permit the SCP Lenders to proceed with claims whose transparent

purpose was to gain negotiating leverage during the sale process, long after the SCP Lenders

began to realize the benefit of the DIP financing and use of cash collateral that the ABL Lenders

facilitated to finance these cases.  The "availability of a waiver defense is especially important in the bankruptcy system," *In re AMF Bowling Worldwide, Inc.*, 278 B.R. 96, 101 (Bankr. E.D. Va. 2002), precisely to prevent this sort of gamesmanship.

Unsurprisingly, bankruptcy courts have rejected attempts by parties to use strategic delay to prejudice other parties in numerous contexts.  *See, e.g.*, *In re Emmons-Sheepshead Bay Dev. LLC*, 518 B.R. 212, 223 (E.D.N.Y. 2014) ("[The bankruptcy court] hardly erred by refusing to adjourn the confirmation hearing to accommodate this eleventh-hour, unreasonably-expansive discovery request."); *In re Chandler*, 459 B.R. 215, 219-20 (Bankr. E.D. Pa. 2011) ("This Court can conceive of no legitimate reason why the Debtor's oral objection to the Plan's valuation of the Property could not have been through normal diligence raised in the Debtor's Objection."); *In re Benedict*, 90 F.3d 50, 55 (2d Cir. 1996) (holding that the debtor waived its right to object to extension of deadline when, at a prior hearing, debtor "had the opportunity to object to the bankruptcy court's extension of time, but failed to do so").  The Court should do the same here, and find that Salus's waiver of its claims is an independent basis to dismiss the Complaint.

## IV.    The Sale Order Moots Salus's Remaining Non-Disgorgement Claims

Salus's three remaining claims—the First, Third and Fifth counts of the Complaint (the "Non-Disgorgement Claims")—should be dismissed as moot because of the Sale Order, which unequivocally recognizes the validity and senior priority of the ABL Lenders' liens on the ABL Priority Collateral, and which resulted in the ABL Lender claims at issue here being paid in full.

"Article III requires that a plaintiff's claim be live not just when he first brings the suit but throughout the entire litigation, and once the controversy ceases to exist the court must dismiss the case for lack of jurisdiction."  *Lusardi v. Xerox Corp.*, 975 F.2d 964, 974 (3d Cir. 1992).  A plaintiff's claims are moot if "changes in circumstances from what prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief."  *In re AE*

*Liquidation, Inc.*, 435 B.R. 894, 900, 903 (Bankr. D. Del. 2010).  Moreover, at any time in the litigation a court may consider evidence outside the pleadings to resolve factual issues bearing on jurisdiction.  *Id.*

The Court will not be able to fashion any meaningful relief to Salus with respect to the Non-Disgorgement Claims without affecting the validity of the final sale of RadioShack's assets to General Wireless.  In the Non-Disgorgement Claims, Salus seeks Court orders that would have the effect of subordinating ABL Lender claims against the Debtors for principal and interest in the bankruptcy proceeding—claims for outstanding principal and interest that have already been paid in full pursuant to the Sale Order.  But the Court has already approved the sale of RadioShack assets, including ABL Priority Collateral, to General Wireless.  Sale Order ¶ V.  The Court further determined that General Wireless's credit bid comprised of "allowed secured claims" "not subject to challenge . . . or subordination" that were "secured by valid, binding, enforceable and perfected first priority priming liens  . . .  on . . . ABL Priority Collateral."  *Id.* The Sale Order further provided that upon closing, all cash proceeds of ABL Priority Collateral were to be paid directly to the DIP Agent for distribution under the waterfall governing the priorities within the ABL Lender group.  *Id.* ¶ 32.  Thus, the claims of the ABL Lenders that Salus now seeks to subordinate have been paid in full and thus no longer exist.[14]

The Sale Order has rendered the Non-Disgorgement Claims moot because it is now impossible for the Court to fashion a relief that would redress Salus' alleged grievances. And while the Sale Order expressly provided that the Non-Disgorgement Claims were not released, an agreement not to release claims does not by itself create a case or controversy to allow those

---

[14] To be clear,  the ABL Lenders have remaining unpaid contingent indemnification claims, but those claims are not at issue here.

claims to survive dismissal for mootness. *See In re Price*, 370 F.3d 362, 365 (3d Cir. 2004)

("[P]arties may not stipulate as to whether a matter is moot. This Court is duty-bound to

independently examine the issue of mootness." (internal citations omitted)).

Because Salus' Non-Disgorgement Claims cannot be redressed by this or any other court,

they must be dismissed.

## CONCLUSION

For the foregoing reasons, the ABL Lenders respectfully request that Salus's Adversary

Complaint be dismissed with prejudice.

Dated:  Wilmington, Delaware
May 1, 2015                                          **BLANK ROME LLP**

                                                    _____*/s/ Stanley B. Tarr*_____
                                                    Stanley B. Tarr (DE No. 5535)
                                                    Victoria Guilfoyle (DE No. 5183)
                                                    1201 N. Market Street, Suite 800
                                                    Wilmington, DE  19801
                                                    Tel: (302) 425-6400
                                                    Fax:  (302) 425-6464
                                                    Email: tarr@blankrome.com
                                                    guilfoyle@blankrome.com

                                                            and

                                                    Lawrence Flick (admitted *pro hac vice*)
                                                    Rick Antonoff (admitted *pro hac vice*)
                                                    Michael Kim (admitted *pro hac vice*)
                                                    The Chrysler Building
                                                    405 Lexington Avenue
                                                    New York, NY  10174-0208
                                                    Tel:  (212) 885-5000
                                                    Fax:  (212) 885-5001
                                                    Email:  flick@blankrome.com
                                                    rantonoff@blankrome.com
                                                    mkim@blankrome.com

and

**DAVIS POLK & WARDWELL LLP**
Damian S. Schaible (admitted *pro hac vice*)
Elliot Moskowitz (admitted *pro hac vice*)
Michael Russano (admitted *pro hac vice*)
Darren S. Klein (admitted *pro hac vice*)
450 Lexington Avenue
New York, NY  10017
Tel:  (212) 450-4000
Fax:  (212) 701-5800
Email: damian.schaible@davispolk.com
elliot.moskowitz@davispolk.com
michael.russano@davispolk.com
darren.klein@davispolk.com

*Counsel to funds managed or advised by
BlueCrest Capital Management (New York)
LP, DW Partners, L.P., Macquarie Credit
Investment Management Inc., Mudrick
Capital Management, LP, Saba Capital
Management, L.P., T. Rowe Price
Associates, Inc. and Taconic Capital
Advisors L.P.*

**MORRIS NICHOLS ARSHT &
TUNNELL LLP**

        */s/ Gregory W. Werkheiser*
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Matthew B. Harvey (No. 5186)
1201 Market Street, Suite 1600
Wilmington, DE 19801
Tel:  302-658-9200
Fax: 302-658-3989
Email: rdehney@mnat.com
gwerkheiser@mnat.com
mharvey@mnat.com

and

**DLA PIPER LLP (US)**
Gregg M. Galardi (admitted *pro hac vice*)
Kevin D. Finger (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020-1104
Tel: 212-335-4500
Fax: 212-335-4501
Email:  Gregg.galardi@dlapiper.com
Kevin.finger@dlapiper.com

*Counsel to General Wireless Inc., Standard*
*General L.P., General Retail Holdings L.P.,*
*and General Retail Funding LLC*