## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                               :
                                                     : Chapter 11
RADIOSHACK CORPORATION, *et al.*,                    :
                                                     : Case No. 15-10197 (BLS)
                          Debtors.                   :
                                                     : (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Salus Capital Partners, LLC, in its capacity as Agent,   :
                                                         :
                          Plaintiff,                     :
                                                         :
            v.                                           :
                                                         :
Standard Wireless Inc.; General Wireless Inc.; Standard   :   Adv. Proc. No. 15-50239
General L.P.; General Retail Holdings L.P.; General       :
Retail Funding LLC; Litespeed Master Fund, Ltd.;         :
Litespeed Management, L.L.C.; Cantor Fitzgerald          :
Securities LLC; BlueCrest Multi Strategy Credit Master   :
Fund Limited; DW Catalyst Master Fund, Ltd.; DW          :
Value Master Fund, Ltd.; Saba Capital Management, LP;    :
Macquarie Credit Nexus Master Fund Limited; Taconic      :
Opportunity Master Fund L.P.; Taconic Master Fund 1.5    :
L.P.; T. Rowe Price Associates, Inc.; Mudrick Capital    :
Management, LP.; and John Does #1-50,                     :
                                                         :
                          Defendants.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AMENDED ADVERSARY COMPLAINT

Plaintiff Salus Capital Partners, LLC, as agent for the SCP Lenders (defined

below) under the SCP Credit Agreement (defined below) ("SCP Agent" or "Plaintiff"), through

its undersigned counsel, for its amended complaint against the defendants, hereby alleges on

knowledge with respect to itself and its actions and on information and belief as to all other

matters, as follows:

## SUMMARY OF ACTION

1.     This is an action for declaratory judgment and other relief enforcing an intercreditor agreement between the SCP Agent (for the benefit of the SCP Lenders) and the agent for the ABL Lenders (defined below) governing their respective rights, priorities and obligations regarding the collateral pledged to each group to secure repayment of their loans provided to RadioShack[1] in December 2013.

2.     On December 10, 2013, RadioShack obtained an $835 million financing package of which (a) $250 million was provided by the SCP Lenders as a term loan (the "SCP Term Loan"), and (b) $585 million was provided by General Electric Capital Corporation ("GE Capital") and a syndicate of asset-based lenders (the "ABL Lenders") in the form of (i) a $50 million term loan (the "ABL Term Loan") and (ii) $535 million in asset-based revolving loan commitments (the "ABL Revolving Loan Commitments").  All of RadioShack's obligations to the SCP Lenders and the ABL Lenders were secured by liens on the same collateral pool – substantially all of RadioShack's assets.  To set forth the relative rights and priorities of the SCP Lenders, on the one hand, and the ABL Lenders, on the other hand, the respective agents for the secured creditors entered into an intercreditor agreement on the closing date (the "Intercreditor Agreement").   In relevant part, the Intercreditor Agreement provided that the ABL Term Loan and the ABL Revolving Loan Commitments were secured on a first-lien basis on the liquid

---

[1]   The Debtors (collectively, "RadioShack"), which filed chapter 11 petitions in this Court on February 5, 2015 (the "Petition Date"), include the following entities: RadioShack Corporation; Atlantic Retail Ventures, Inc.; Ignition L.P.; ITC Services, Inc.; Merchandising Support Services, Inc.; RadioShack Customer Service LLC; RadioShack Global Sourcing Corporation; RadioShack Global Sourcing Limited Partnership; RadioShack Global Sourcing, Inc.; RS Ig Holdings Incorporated; RSIgnite, LLC; SCK, Inc.; Tandy Finance Corporation; Tandy Holdings, Inc.; Tandy International Corporation; TE Electronics LP; Trade and Save LLC; and TRS Quality, Inc.

assets (principally accounts receivable and inventory) of RadioShack (the "Liquid Collateral"), and the SCP Term Loan was secured by the Liquid Collateral on a second-lien basis.[2]

3.         Under the Intercreditor Agreement, the ABL Lenders and the SCP Lenders agreed to limit the amount of the ABL Lenders' loans that could be secured by the Liquid Collateral on a senior priority basis to the SCP Term Loan.  However, in early October 2014, a number of related events occurred:  (i) defendant Cantor Fitzgerald Securities LLC ("Cantor Fitzgerald" or the "ABL Agent") replaced GE Capital as the ABL Agent and was assigned the collateral held by GE Capital; (ii) certain unfunded revolving loan commitments were assigned to defendant General Retail Funding LLC ("GRF"), an affiliate of defendant Standard General; (iii) certain other loans and obligations held by GE Capital and its syndicate were assigned to certain of the defendants and/or their affiliates, as lenders (the "Hedge Fund Lenders"); (iv) GRF purported to refinance the unfunded commitments, the Hedge Fund Lenders refinanced the funded loans, and GRF and the Hedge Fund Lenders amended the terms of their credit agreement with RadioShack (the "ABL Credit Agreement"), among other things, to permanently reduce the asset-based ABL Revolving Loan Commitments by $415 million (of which approximately $232 million in borrowings were then outstanding) by (a) converting those outstanding revolving loans (*i.e.*, loans that could be re-borrowed when repaid) into term loans (*i.e.*, loans that could not be re-borrowed when repaid) (the "Term Out Loans"), and (b) purporting to provide $140 million of illusory revolving loan commitments as "Effective Date Revolving Commitments" which were never expected or intended to be drawn on given the

---

[2]    The Intercreditor Agreement also provided that the SCP Term Loan was secured on a first-priority basis on the fixed assets of Radio Shack (*e.g.*, real estate, improvements, intellectual property and capital stock), and the ABL Term Loan and the ABL Revolving Loan Commitments were secured on a second-lien basis by such fixed assets; however, the liens (and relative priorities of such liens with respect to the ABL Lenders and the SCP Lenders) on the fixed asset collateral are not in dispute.

financial condition of RadioShack and, thus, were not bona fide commitments to lend.  As explained in detail below, this amendment significantly limited the amount of the ABL Lenders' loans that could be repaid with the proceeds of Liquid Collateral prior to the repayment in full of the SCP Term Loan.

4.      The official committee of unsecured creditors (the "Committee") in the Debtors' chapter 11 cases has alleged that the October 2014 restructuring of the ABL Lenders' loans was part of a scheme by the Hedge Fund Lenders to manipulate the market for credit default swaps ("CDS") maturing December 20, 2014 with RadioShack's $325 million of bonds as the reference security.  Specifically, in connection with its motion (Docket No. 304) for authorization to conduct an examination of the Debtors and certain third parties, including the defendants herein and/or their affiliates, under Bankruptcy Rule 2004, the Committee stated as follows:

> Several of the Participating Investors, including BlueCrest Capital Management LLP, DW Investment Management LP, Mudrick Capital Management, and Saba Capital Management LP (and/or any funds managed by or affiliated with the foregoing), had reportedly sold CDS protection on RadioShack bonds, betting that the company would not default on its bonds – at least not before December 20, 2014.  If the company did default before that date, the Participating Investors who had sold that CDS protection would have suffered massive losses.  The October 2014 Transaction however, enabled the Participating Investors to avoid such losses and keep the Debtors out of bankruptcy until after December 20, 2014. This way, the Participating Investors that had previously sold CDS on RadioShack bonds could pocket the upfront payments received from the purchasers of that protection and actually prevent their own losses by orchestrating when RadioShack would default.
>
> *        *        *
>
> The question of whether a credit event under CDS written on RadioShack bonds had occurred was put to the International Swaps and Derivatives Association ("ISDA"), allegedly at the prompting of an analyst who argued in a letter to ISDA that the October 2014 Transaction was undertaken to manipulate the CDS market in order to avoid triggering a default prior to the December 20, 2014 CDS termination date.

*     *     *

Notably, Standard General and LiteSpeed together owned almost 20% of RadioShack's common stock, with contingent equity rights that would have given them majority control as well as the ability to appoint up to 4 members of a newly-constituted 7-member board of directors. These shareholders acquired the loans outstanding under GE Capital's Credit Agreement in connection with the October 2014 Transaction and immediately added on various provisions designed to control the timing of a bankruptcy filing, which was delayed to help Participating Investors that had written CDS on RadioShack debt.

*     *     *

An investigation is warranted to determine whether Standard General, LiteSpeed, and/or other Participating Investors (or their affiliates) wrote CDS contracts on RadioShack bonds such that they had a motive to enter into the October 2014 Transaction either to injure RadioShack or to prevent CDS losses while such entities were in possession of material non-public information ("MNPI") and, taking all facts into account, in a position to influence the fate of RadioShack, including the timing of its bankruptcy filing. A Rule 2004 investigation is similarly warranted to determine if any of the Participating Investors were executing a "steepener" strategy, betting that RadioShack would not default in the short term (because they were ensuring that that would not happen through the October 2014 Transaction and the Transaction Committee's consultation rights), but would likely default in early 2015. In this regard, a review of the agreements underlying the October 2014 Transaction reveals provisions that indicate that the Participating Investors may have been executing such a "steepener" strategy. For example, while the October 2014 Transaction may have been specifically engineered to prevent a default in the fourth quarter of 2014, several new events of defaults imposed by the First Amendment would likely be triggered in the first quarter of 2015. If the goal of the October 2014 Transaction was to delay bankruptcy for four months, the benefits that RadioShack and its other stakeholders received for such transaction must be investigated and assessed.

5.     The Committee was granted leave to, and did, conduct a Rule 2004 examination. Plaintiff asked for, and the Committee agreed to provide, all of the documents and information produced in the examination, but only with the consent of the parties who produced the discovery, including the defendants herein. Those consents were not forthcoming, and Plaintiff has not had access to most of the evidence produced to the Committee.

6.      One category of information that the Committee did not obtain in its Rule 2004 examination, because the Hedge Fund Lenders vigorously opposed it, was their CDS trading information – how much CDS protection the Hedge Fund Lenders sold (or bought), when, at what prices, etc.  But based on the market information that is available, the Hedge Fund Lenders who sold RadioShack CDS protection may well have been exposed to potential "massive losses," as the Committee asserted, if a credit event (*e.g.*, a bankruptcy filing) had occurred on or before the December 20, 2014 maturity date.  More than $23 billion of such CDS contracts were outstanding, and in late September and early October 2014 – just before the ABL debt refinancing transactions were announced – CDS contracts were selling at about $30 bid for $100 of protection; by comparison, after the refinancing was publicly disclosed, the CDS protection price dropped to the $5-$7 range.  Thus, for example, if the Hedge Fund Lenders had advance knowledge of the RadioShack refinancing transactions in late September 2014 and, at the same time, were selling $1 billion of CDS protection, they would have locked in approximately $300 million of profit in upfront payments knowing that a credit event by December 20, 2014 would be avoided, since the refinancing would provide RadioShack with an additional $140 million of liquidity, which would not have been available but for the refinancing and replacement of GE Capital with defendant Cantor Fitzgerald as the ABL Agent, to get through the year-end holiday retail selling season.  Moreover, in this example, regardless of when the Hedge Fund Lenders sold the CDS protection – before or after they first received the inside information concerning the RadioShack refinancing transactions – they would have had a tremendous incentive to participate in the refinanced loans to RadioShack, which would have been dwarfed by a potential $1 billion of CDS loss exposure.  Also, the Hedge Fund Lenders would have known that their loans to RadioShack were virtually certain of being repaid in full,

and that their actions assured that the SCP Lenders would suffer the diminution in value caused by the continuing losses that RadioShack would rack up as a result of the increased liquidity made available to it by the Hedge Fund Lenders and the ABL Agent and the delayed bankruptcy filings until after the December 20, 2014 CDS maturity date.

7.    The reasonable inference from the facts alleged by the Committee and in other public reports regarding RadioShack and the related CDS market is that the October 2014 restructuring transactions were intended to, and did, enable the Hedge Fund Lenders with CDS exposure to manipulate the CDS market for their own benefit and to the detriment of RadioShack's other creditors, including the SCP Lenders, and, therefore, were grossly negligent, reckless or wilful misconduct by the Hedge Fund Lenders, the ABL Agent and those who aided and abetted them.  Those same transactions also breached the ABL Agent's and the Hedge Fund Lenders' duty of good faith and fair dealing under the Intercreditor Agreement to the extent they were structured or intended to deprive the SCP Lenders of their lawful right to proceeds of the Liquid Collateral.

8.    As of the Petition Date, of the $232 million of Term Out Loans that the Hedge Fund Lenders made to RadioShack in October 2014, approximately $129 million had been repaid, and $103 million remained outstanding, all of which now has been repaid.  Because the Term Out Loans are not permitted to be repaid with proceeds of the Liquid Collateral prior to repayment in full of the SCP Term Loan, all amounts repaid thereon to the Hedge Fund Lenders must be disgorged or turned over and paid to the SCP Lenders until the SCP Term Loan is satisfied in full.

9.    Therefore, Plaintiff seeks an order awarding specific performance of the Intercreditor Agreement and requiring disgorgement or turn over to the SCP Lenders of all

payments received by the Hedge Fund Lenders on account of the Term Out Loans, as well as monetary damages in an amount to be determined at trial.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§157, 1334 and 2201.

11. This adversary proceeding is a core proceeding pursuant to pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O) and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

12. Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## APPLICABLE LAW

13. The Intercreditor Agreement is enforceable against the ABL Agent and the Hedge Fund Lenders in these cases pursuant to Bankruptcy Code Section 510(a).

14. The parties expressly agreed in Section 12.7 of the Intercreditor Agreement that it "shall be interpreted, and the rights and liabilities of the parties bound hereby determined, in accordance with the laws of the State of New York."

15. Section 12.8 of the Intercreditor Agreement provides that the parties may demand specific performance of the agreement.

## PARTIES

16. Plaintiff is a Delaware limited liability company with its principal place of business at 197 First Avenue, Suite 250, Needham Heights, MA 02494-2816.

17. Defendant Standard General L.P. ("Standard General") is a Delaware limited partnership with its principal place of business at 767 Fifth Avenue, 12th Floor, New York, NY 10153.

18.     Defendants Standard Wireless Inc., General Wireless Inc.,  General Retail Holdings L.P. ("GRH") and GRF are affiliates of Standard General.  In addition, defendants GRH and GRF are ABL Lenders.

19.     Defendants Litespeed Master Fund, Ltd. and Litespeed Management, L.L.C. (together, "Litespeed") are affiliates and, either directly or indirectly through their equity position in defendant GRH, ABL Lenders.

20.     Defendant Cantor Fitzgerald, as successor to GE Capital,  is the administrative and collateral agent for the ABL Lenders in connection with the ABL Credit Agreement and, as the successor ABL Agent, is a party to the Intercreditor Agreement.

21.     Defendants BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd., Saba Capital Management, LP, Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund L.P., Taconic Master Fund 1.5 L.P., T. Rowe Price Associates, Inc., and Mudrick Capital Management, LP are ABL Lenders.  Defendants BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd., Saba Capital Management, LP and Mudrick Capital Management, LP, and/or their affiliates, were invested in RadioShack CDS and participated in the wrongful CDS market manipulation that the October 2014 refinancing transactions were designed and intended to facilitate, and were aided and abetted by the other defendants and/or their affiliates.

22.     Defendants John Does #1-50 are additional participating ABL Lenders and related parties, recipients of proceeds of the Term Out Loans, and/or participants in the wrongful CDS market manipulation scheme, whose identities are not yet known but will be developed through discovery.

# FACTUAL BACKGROUND

### A.     The SCP Credit Agreement

23.     On or about December 10, 2013, Salus Capital Partners, LLC, Salus CLO 2012-1, Ltd., Cerberus Levered Loan Opportunities Fund II, LP, Cerberus NJ Credit Opportunities Fund, L.P. and Cerberus ASRS Holdings LLC (collectively, the "SCP Lenders") entered into a credit agreement with RadioShack (the "SCP Credit Agreement").  Under this agreement, the SCP Lenders agreed to provide the $250 million SCP Term Loan to RadioShack and related entities.  Each SCP Lender appointed Plaintiff as agent for the SCP Lenders to, among other things, "take such action on [each SCP Lender's] behalf and to exercise all rights, powers and remedies and perform the duties as are expressly delegated to Agent" under the SCP Credit Agreement and related agreements and "exercise such powers as are incidental thereto."

24.     Pursuant to the related SCP Security Agreement,[3] repayment of the obligations outstanding under the SCP Credit Agreement was secured by a lien on substantially all of RadioShack's existing and after acquired assets, including (i) a first priority lien on fixed assets, intellectual property, and stock and other equity interests of RadioShack's subsidiaries, and (ii) a second priority lien on RadioShack's Liquid Collateral.

25.     When the SCP Lenders extended the loan, RadioShack already was experiencing financial distress, with reported losses of $139.4 million and $400.2 million in 2012 and 2013, respectively.  Despite its poor financial condition, RadioShack was able to obtain $835 million in new financings from the SCP Lenders and the ABL Lenders, the proceeds of which were to be used to repay existing debt and fund an operational turnaround.  Given RadioShack's tenuous financial condition, the SCP Lenders carefully negotiated the agreements governing their

---

[3]   Guaranty and Security Agreement, dated as of December 10, 2013, by RadioShack and in favor of Salus Capital Partners, LLC, as Agent for the SCP Lenders (the "SCP Security Agreement").

loan – including the Intercreditor Agreement – to include specific provisions to protect their investments and maximize their ability to recover all of the amounts they loaned.  These protections included security interests in all of RadioShack's Liquid Collateral to secure repayment of the obligations, as well as Intercreditor Agreement provisions requiring that only the ABL Term Loan and asset-based revolving loans could come ahead of the SCP Lenders' liens on RadioShack's Liquid Collateral.  The SCP Lenders relied on each of the terms of the related agreements in connection with their agreement to provide the SCP Term Loan.

26.    Pursuant to the terms of the SCP Credit Agreement, on December 10, 2013, the SCP Lenders advanced the $250 million SCP Term Loan to RadioShack.  As of the Petition Date, substantially all of the principal balance remained outstanding.

**B.    The ABL Credit Agreement**

27.    The same day that RadioShack and the SCP Lenders closed the SCP Term Loan, RadioShack also entered into a secured credit facility, the ABL Credit Agreement, with the separate ABL Lender syndicate led by GE Capital.

28.    Under the ABL Credit Agreement, the ABL Lenders agreed to provide to RadioShack a $535 million revolving asset-based credit facility and the $50 million ABL Term Loan (together, the "ABL Loans").

29.    Pursuant to the ABL Guaranty and Security Agreement, dated as of December 10, 2013, by RadioShack and in favor of GE Capital, as agent for the ABL Lenders, the ABL Credit Agreement was secured by substantially all of RadioShack's existing and after acquired assets, including (i) a first priority lien on RadioShack's Liquid Collateral, and (ii) a second priority lien on RadioShack's fixed assets, intellectual property, and stock and other equity interests of RadioShack's subsidiaries.

C.    **The Intercreditor Agreement**

30.    In connection with the SCP Credit Agreement and the ABL Credit
Agreement, Plaintiff, as agent for the SCP Lenders, and GE Capital, as agent for the ABL
Lenders, entered into the Intercreditor Agreement, dated as of December 10, 2013.  The
Intercreditor Agreement sets forth the respective rights, priorities and obligations of the two
groups of secured lenders with respect to the RadioShack collateral pledged to each group to
secure repayment of their loans.  Thus, the Intercreditor Agreement governs the relative priority
of the SCP Lenders' and the ABL Lenders' liens securing their claims in respect of one another.

31.    Among the bargained-for protections provided to the SCP Lenders under
the Intercreditor Agreement are restrictions limiting (i) the application of the proceeds of Liquid
Collateral to the repayment of loans under the ABL Credit Agreement to a "Maximum ABL
Facility Amount" prior to the application of such proceeds to the repayment of the SCP Term
Loan, and (ii) the type of such loans that could receive proceeds of Liquid Collateral to asset-
based revolving loans (other than the ABL Term Loan).  These provided important protections
and comforts to the SCP Lenders because, among other reasons, the ABL Lenders' facility would
be constrained by a revolver borrowing base and would be agented by an experienced asset-
based lender (such as GE Capital, the original agent), which would establish appropriate
discretionary reserves and otherwise behave in the customarily conservative manner of asset-
based lenders.

D.    **The October 2014 Transactions**

32.    In a Form 10-Q filed with the United States Securities and Exchange
Commission on September 11, 2014, RadioShack disclosed its dire financial condition:

> If acceptable terms of a sale or partnership or out-of court restructuring cannot be
> accomplished, we may not have enough cash and working capital to fund our
> operations beyond the very near term, which raises substantial doubt about our

ability to continue as a going concern. As a result, we may be required to seek to implement an in-court proceeding under Chapter 11 of the United States Bankruptcy Code ("Bankruptcy Code").

33.     Shortly thereafter, the SCP Lenders learned from media reports citing RadioShack management that RadioShack had determined to enter into transactions with its two largest shareholders, defendants Standard General and Litespeed, to restructure the ABL Credit Agreement in order to obtain additional liquidity.

34.     Specifically, on October 3, 2014, RadioShack entered into a series of agreements (collectively, the "October 2014 Transactions") with, among others, defendants GRH and GRF, which were formed by defendant Standard General solely for the purpose of engaging in these transactions with RadioShack.  The stated purpose of the October 2014 Transactions – including a loan sale agreement and an amendment to the ABL Credit Agreement – was to restructure RadioShack's debt under the ABL Credit Agreement and to provide RadioShack with additional short-term liquidity.  As a result of this integrated series of transactions, RadioShack's two largest shareholders (and their affiliates and related funds) acquired the ABL Loans and became the replacement ABL Lenders.

35.     First, RadioShack arranged a Loan Sale Agreement pursuant to which GRH and GRF acquired from GE Capital and the other original ABL Lenders all of their interests in the then outstanding ABL Loans and related financial commitments under the ABL Credit Agreement.  Shortly thereafter, the other named defendants herein acquired participating interests in the then outstanding ABL Loans.  At the same time, GE Capital assigned its administrative and collateral agent role (and the related security interest granted to it) to defendant Cantor Fitzgerald, which became the administrative and collateral agent under the restructured ABL Credit Agreement.

36.     Second, RadioShack entered into a First Amendment to the ABL Credit Agreement (the "First Amendment") with the new ABL Lenders and Cantor Fitzgerald.  Among other changes:

(i) The First Amendment permanently reduced the asset-based ABL Revolving Loan Commitments by $415 million, from $535 million to $120 million (comprised of a fully-funded $120 million letter of credit facility (the "Letter of Credit Facility")).

(ii) The First Amendment converted $275 million of what previously had been available for revolving loans (*i.e.*, loans that could be re-borrowed when repaid) into the Term Out Loans (*i.e.*, loans that could not be re-borrowed when repaid), of which, at the time of the amendment, approximately $232 million in borrowings were then outstanding.  These are, in fact, term loans, notwithstanding the First Amendment's definition of them as "Term Out ***Revolving*** Loans" (emphasis added).

(iii) The First Amendment purported to provide $140 million worth of "Effective Date Revolving Commitments" which, based on RadioShack's financial condition and restructuring plans, would never be available to be borrowed, since there would never be sufficient borrowing base availability to allow for additional funds to be advanced to RadioShack (the "Illusory Commitments").

(iv) The First Amendment released discretionary reserves and restored the method used to calculate the borrowing base under the ABL Credit Agreement to the one in effect in December 2013.  This increased RadioShack's borrowing availability by approximately $142 million, which it immediately accessed, allowing $142

million more of debt to be incurred under the ABL Credit Agreement than would

have been available if the defendants had not replaced GE Capital with Cantor

Fitzgerald as agent or had assigned the agent role to another experienced asset-

based lending institution.

37.    As described above, one purpose of the October 2014 Transactions was to

facilitate the Hedge Fund Lenders' scheme to manipulate the CDS market by delaying a

RadioShack chapter 11 filing past the December 20, 2014 maturity date and into the first quarter

of 2015.  However, because the Hedge Fund Lenders were precluded from making revolving

loan commitments, in order to participate in the RadioShack refinancing, they needed to

restructure the outstanding revolving loans by converting them into term loans, *i.e.*, the Term Out

Loans.  But, under the terms of the Intercreditor Agreement, doing so would cause the amount of

such loans to be excluded from the portion of debt under the ABL Credit Agreement that could

be repaid with the proceeds of Liquid Collateral prior to repaying in full the SCP Term Loan,

because only the Letter of Credit Facility (which was within the $120 million Maximum ABL

Facility Amount) could be so repaid before exceeding the Maximum ABL Facility Amount.

Therefore, the defendants tried to structure the October 2014 Transactions in a way that would

let the Hedge Fund Lenders have their cake and eat it too, by arguing, as they have in this action,

that the transactions were simply a "relabeling" of the "outstanding, previously-funded and

unarguably senior loan amounts from 'Revolving Loans' into 'Term Out Revolving Loans'" that

did not effect any substantive change in the respective lien positions of the two secured lender

groups.[4]

---

[4]    *See* Memorandum Of Law In Support Of The Motion Of The ABL Lenders To Dismiss The Adversary
Complaint Of Salus Capital Partners, LLC at 2 (Adv. Pro. Docket No. 16).

38.     No matter how the defendants chose to label their loans to RadioShack, the substance remained the same.  The Term Out Loans were term loans, not revolving loans. The Illusory Commitments were not bona fide commitments to lend.  Therefore, under the Intercreditor Agreement, the Term Out Loans were not permitted to be repaid with the proceeds of the Liquid Collateral until such proceeds were applied to repay the SCP Term Loan in full, because only the Letter of Credit Facility could be so repaid before exceeding the Maximum ABL Facility Amount. Thus, the payments received by the Hedge Fund Lenders from the proceeds of the Liquid Collateral belong to the SCP Lenders, and the defendants' effort to deprive the SCP Lenders of their contractual rights to those payments breaches the Intercreditor Agreement and tortiously interferes with the SCP Lenders' rights thereunder and under the SCP Credit Agreement.

39.     On December 1, 2014, Plaintiff provided notice to RadioShack and the ABL Agent identifying several events of default under the SCP Credit Agreement as a result of the October 2014 Transactions which included the basis for the resulting Intercreditor Agreement claims set forth herein.

E.     **The Intercreditor Agreement Limits Amount Of Indebtedness Under The ABL Credit Agreement That Can Be Repaid With The Proceeds Of Liquid Collateral Before Applying Such Proceeds To Repay The SCP Term Loan In Full.**

40.     The Term Out Loans resulting from the October 2014 Transactions are ***not*** Senior ABL Claims entitled to repayment with the proceeds of the Liquid Collateral prior to the application of such proceeds to repay in full the SCP Term Loan pursuant to the Intercreditor Agreement; only the claims arising under the Letter of Credit Facility are.  As explained below, the Term Out Loans are Excluded ABL Claims and, under the priority of liens provisions agreed to among the secured lenders, may not be repaid with the proceeds of Liquid Collateral until after the SCP Term Loan is repaid in full with such proceeds, because only the Letter of Credit

Facility could be so repaid before exceeding the Maximum ABL Facility Amount. Moreover, the

"Effective Date Revolving Commitments" were not bona fide commitments to lend, as defendant

GRF knew when it agreed to provide such "commitments" that they would never be funded; thus,

the amount of the Illusory Commitments also must be excluded in determining the Maximum

ABL Facility Amount that may be repaid with the proceeds of Liquid Collateral before the SCP

Term Loan is repaid with such proceeds.

     41.    Section 2.1(a) of the Intercreditor Agreement provides:

> Notwithstanding the date, manner or order of grant, attachment or perfection of any Junior Lien in respect of any Collateral or of any **Senior Lien** in respect of any Collateral and notwithstanding any provision of the UCC, any applicable law or any Collateral Document, . . . any **Senior Lien** in respect of such Collateral, regardless of how acquired, whether by grant, statute, operation of law, subrogation or otherwise, shall be and shall remain senior and prior to any Junior Lien in respect of such Collateral.

(Emphasis added).

     42.    With respect to the ABL Priority Collateral, Section 1.2 of the

Intercreditor Agreement provides as follows:

(i)  A "Senior Lien" is a lien securing all "Senior ABL Claims."

(ii) "Senior ABL Claims" are "all ABL Claims other than Excluded ABL

Claims."

(iii) "Excluded ABL Claims" include "the aggregate outstanding principal amount

of loans and outstanding amount of Letters of Credit made, issued or incurred

pursuant to the ABL Loan Documents in excess of the Maximum ABL Facility

Amount at the time of such making, issuance or incurrence and any interest, fees

or reimbursement obligations accrued on or with respect to such excess amounts."

(iv)  The "Maximum ABL Facility Amount" is "the Aggregate Revolving Loan

Commitments minus any permanent reductions in the Revolving Loan

Commitments."

43.    Pursuant to the First Amendment to the ABL Credit Agreement, the ABL

Lenders agreed to "term out" – *i.e.*, convert to the Term Out Loans – approximately $275 million

of revolving asset-based loans.  Since the Term Out Loans no longer constituted revolving loans,

the Revolving Loan Commitments were permanently reduced by $275 million.  Moreover, since

the Illusory Commitments were not bona fide commitments (since there was no expectation that

RadioShack would ever be able to access such "commitments" based on its financial condition

and the borrowing base limitations), the aggregate amount of Revolving Loan Commitments was

further permanently reduced by the amount of the Illusory Commitments (*i.e.*, $140 million),

resulting in a reduction of the Maximum ABL Facility Amount under the Intercreditor

Agreement to $120 million (*i.e.*, the original $535 million in revolving commitments minus $275

million in commitments that were permanently reduced by "terming out" the related revolving

loans and $140 million in commitments that were permanently reduced when the original

revolving commitments were converted into the Illusory Commitments).

44.    When the ABL Lenders made the Term Out Loans in connection with the

October 2014 Transactions and converted Revolving Loan Commitments into the Illusory

Commitments, the total amount of commitments outstanding under the ABL Credit Agreement

was reduced to $120 million,[5] and thus the Maximum ABL Facility Amount was exceeded by

$415 million.

---

5  In total, there remained $170 million of outstanding commitments, including the original $50 million ABL Term
Loan facility which is a senior lien claim not addressed or disputed by this Amended Complaint.  The balance of
the outstanding commitments was comprised of the $120 million Letter of Credit Facility.

45.     Therefore, pursuant to the Intercreditor Agreement, the $275 million of commitments for Term Out Loans under the ABL Credit Agreement and the $140 million of Illusory Commitments must be excluded in determining the Maximum ABL Facility Amount, with the result that the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full with such proceeds, because only the $120 million Letter of Credit Facility could be so repaid before exceeding the Maximum ABL Facility Amount.  The outstanding balance of the Term Out Loans in October 2014 was approximately $232 million, of which, as of the Petition Date, about $129 million had been repaid to the Hedge Fund Lenders, leaving a then-present balance of $103 million, all of which has since been repaid. The Letter of Credit Facility also has been fully repaid.  Accordingly, all repayments improperly received by the Hedge Fund Lenders on the Term Out Loans from the proceeds of Liquid Collateral belong, and must be disgorged or turned over, to the SCP Lenders.

**F.     The Term Out Loans Are Not Revolving Asset-Based Loans.**

46.     Separate and apart from the permanent reduction of the ABL Revolving Loan Commitment, the Intercreditor Agreement independently prohibits the Term Out Loans from being repaid with the proceeds of Liquid Collateral prior to repayment in full of the SCP Term Loan because they are term loans, not asset-based revolving loans.

47.     The Intercreditor Agreement explicitly provides that the only loans (other than the ABL Term Loan) that may be repaid with the proceeds of the Liquid Collateral prior to repayment of the SCP Term Loan are asset-based revolving loans.

48.     The Term Out Loans could not be re-borrowed once repaid and, therefore, were no longer revolving loans in form or substance.  The altered nature of the Term Out Loans also stripped from the SCP Lenders their bargained-for protections and comforts traditionally

associated with subordination of their lien on Liquid Collateral to the lien on such collateral securing revolving asset-based loans.

49.    As a result of the conversion of asset-based revolving loans to term loans held by the Hedge Fund Lenders, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral prior to the repayment in full of the SCP Term Loan, because only the Letter of Credit Facility constitutes revolving loans that come within the Maximum ABL Facility Amount. Therefore, payments received by the Hedge Fund Lenders on account of their Term Out Loans must be disgorged or turned over to the SCP Lenders.

**G.    Closing Date Definitions Govern**

50.    The Intercreditor Agreement allows the ABL Lenders' loans to be repaid with the proceeds of Liquid Collateral prior to the repayment of SCP Lenders' loans only to the extent the ABL loans are revolving asset-based facilities in amounts not exceeding the "Maximum ABL Facility Amount."

51.    The Intercreditor Agreement's definition of "Maximum ABL Facility Amount" references certain defined terms from the ABL Credit Agreement.  Importantly, Section 1.2 of the Intercreditor Agreement (titled "Definitions"), provides, "[u]nless otherwise defined herein, terms are used herein as defined in the ABL Credit Agreement as in effect on the date hereof."  The Intercreditor Agreement is dated as of December 10, 2013.  Therefore, the definitions of the ABL Credit Agreement relevant to these issues are the definitions as of December 10, 2013, other than amendments expressly permitted by the Intercreditor Agreement.

52.    However, in connection with October 2014 Transactions, the ABL Lenders changed certain defined terms in the ABL Credit Agreement through the First Amendment, including the definition of "Revolving Loan Commitment," which was changed to include "[ABL] Lender's Outstanding Term Out *Revolving* Loans" (emphasis added) and the

"Effective Date Revolving Commitments" (*i.e.*, the Illusory Commitments) within its definition. This change was not permitted by the Intercreditor Agreement, and the original definition must govern.

53.     By this simple sophistry, the First Amendment purports to re-characterize the ABL Lenders' Term Out Loans as revolving asset-based loans for purposes of the loan documents and further purports to provide RadioShack with revolving loan commitments (*i.e.*, the Illusory Commitments) that RadioShack would never be able to access and which were only provided for in order to artificially inflate the aggregate amount of Revolving Loan Commitments supposedly available to RadioShack.

54.     But that is not how the term was defined on December 10, 2013 – the relevant date for these purposes – and, more importantly, that is not what the SCP Lenders bargained for when they agreed to permit only true revolving asset-based loans to be repaid with the proceeds of Liquid Collateral prior to the repayment in full of the SCP Term Loan.

### FIRST CAUSE OF ACTION
### Declaratory Judgment

55.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

56.     At the time the Hedge Fund Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $120 million (*i.e.*, the Letter of Credit Facility), and thus the Maximum ABL Facility Amount was exceeded by $415 million.  Pursuant to the Intercreditor Agreement, the $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, thus decreasing the Maximum ABL Facility Amount, which also was decreased by the $140 million of Illusory Commitments.  Excluded ABL Claims may not be paid

with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full, because only the $120 million Letter of Credit Facility could be (and was) so repaid before exceeding the Maximum ABL Facility Amount.  Since the Term Out Loans have been repaid with the proceeds of Liquid Collateral, all such repayment amounts must be disgorged or turned over to the SCP Lenders.

57.    An actual legal and substantial controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

58.    Plaintiff is entitled to a declaratory judgment, pursuant to the Intercreditor Agreement, determining the total amount of the loans under the ABL Credit Agreement that may be repaid with the proceeds of Liquid Collateral prior to the repayment of the SCP Term Loan.

<u>SECOND CAUSE OF ACTION</u>
**Declaratory Judgment**

59.    Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

60.    At the time the Hedge Fund Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $120 million (*i.e.*, the Letter of Credit Facility), and thus the Maximum ABL Facility Amount was exceeded by $415 million.  Pursuant to the Intercreditor Agreement, the $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, thus decreasing the Maximum ABL Facility Amount, which also was decreased by the $140 million of Illusory Commitments.  Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP

Term Loan is repaid in full, because only the $120 million Letter of Credit Facility could be so (and was) repaid before exceeding the Maximum ABL Facility Amount.  Since the Term Out Loans have been repaid with the proceeds of Liquid Collateral, all such repayment amounts must be disgorged or turned over to the SCP Lenders.

61.     As of the Petition Date, approximately $103 million of the Term Out Loans remained outstanding, and should not have been repaid, but were repaid thereafter, with the proceeds of the Liquid Collateral prior to the repayment in full of the SCP Term Loans in violation of the Intercreditor Agreement.

62.     An actual legal and substantial controversy exists, which is of sufficient immediacy to warrant judicial relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2.

63.     Plaintiff is entitled to a declaratory judgment, pursuant to the Intercreditor Agreement, determining the total amount of the loans under the ABL Credit Agreement that may be repaid with the proceeds of Liquid Collateral prior to the repayment of the SCP Term Loan.

### THIRD CAUSE OF ACTION
### Disgorgement Or Turn Over Of Loan Repayments

64.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

65.     At the time the Hedge Fund Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $120 million (*i.e.*, the Letter of Credit Facility), and thus the Maximum ABL Facility Amount was exceeded by $415 million.  Pursuant to the Intercreditor Agreement, the $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, thus decreasing the Maximum ABL Facility Amount, which also was decreased by the $140 million of Illusory Commitments.  Excluded ABL Claims may not be paid

with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full, because only the $120 million Letter of Credit Facility could be (and was) so repaid before exceeding the Maximum ABL Facility Amount.  Since the Term Out Loans have been repaid with the proceeds of Liquid Collateral, all such repayment amounts must be disgorged or turned over to the SCP Lenders.

66.     Between the First Amendment closing date and the Petition Date, approximately $129 million of the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amount should have been applied to repay the SCP Term Loan.  Since the Petition Date, approximately $103 million of the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amount should have been applied to repay the SCP Term Loan.

67.     The Hedge Fund Lenders have no legitimate claim to these amounts and will be unjustly enriched if not required to disgorge or turn over these amounts.

68.     The Hedge Fund Lenders should be required to disgorge or turn over these amounts and/or the value of the benefit derived therefrom to the SCP Lenders.

69.     The Hedge Fund Lenders hold these amounts in constructive trust for the benefit of the SCP Lenders.

70.     Plaintiff is entitled to a judgment requiring the Hedge Fund Lenders to disgorge or turn over any and all amounts received in connection with the Term Out Loans.

71.     All disgorged or turned over amounts should be paid to Plaintiff, for the benefit of the SCP Lenders, pursuant to the terms of the Intercreditor Agreement.

## FOURTH CAUSE OF ACTION
### Breach Of Contract And Specific Performance

72.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

73.     On or about December 10, 2013, the respective agents for the SCP Lenders and ABL Lenders entered into the Intercreditor Agreement, which sets forth the relative rights and priorities of the SCP Lenders and the ABL Lenders in connection with RadioShack's obligations to both lenders on account of the $835 million financing package it received from them on December 10, 2013.

74.     Although the SCP Lenders and Hedge Fund Lenders are not parties to the Intercreditor Agreement, they have certain obligations under the Intercreditor Agreement and are also explicitly recognized as intended third party beneficiaries under Section 12.11 of the Intercreditor Agreement.

75.     At all times, the SCP Agent has performed all of its obligations under the Intercreditor Agreement.

76.     Section 12.8 of the Intercreditor Agreement provides that the parties may demand specific performance of the agreement.

77.     At the time the Hedge Fund Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of commitments outstanding under the ABL Credit Agreement was reduced to $120 million (*i.e.*, the Letter of Credit Facility), and thus the Maximum ABL Facility Amount was exceeded by $415 million.  Pursuant to the Intercreditor Agreement, the $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, thus decreasing the Maximum ABL Facility Amount, which also was decreased by the $140 million of Illusory Commitments.  Excluded ABL Claims may not be paid

25

with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full, because only the $120 million Letter of Credit Facility could be (and was) so repaid before exceeding the Maximum ABL Facility Amount.  Since the Term Out Loans have been repaid with the proceeds of Liquid Collateral, all such repayment amounts must be disgorged or turned over to the SCP Lenders.

78.     Moreover, by manipulating the CDS market and structuring the October 2014 Transactions in order to deprive the SCP Lenders of their priority lien rights in the Liquid Collateral, the ABL Agent and Hedge Fund Lenders breached the duty of good faith and fair dealing under the Intercreditor Agreement.

79.     By collecting payments of Excluded ABL Claims with the proceeds of Liquid Collateral instead of causing such proceeds to be applied to repay the SCP Term Loan, the ABL Agent and Hedge Fund Lenders have breached and are continuing to breach the Intercreditor Agreement.

80.     Plaintiff is entitled to a judgment of specific performance with respect to the ABL Agent's and Hedge Fund Lenders' obligations under the Intercreditor Agreement.

## FIFTH CAUSE OF ACTION
### Breach Of Implied Covenant Of Good Faith And Fair Dealing

81.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

82.     Under the Intercreditor Agreement between the ABL Agent and the SCP Agent, there exists an implied covenant of good faith and fair dealing.

83.     At all times, the SCP Agent has performed all of its obligations under the Intercreditor Agreement.

84.     Section 12.11 of the Intercreditor Agreement provides that the agreement "shall be binding upon, and the rights and benefits shall inure to the benefit of, the Secured Parties", which include the SCP Lenders.

85.     At the time the Hedge Fund Lenders made the Term Out Loans in connection with the October 2014 Transactions, the total amount of bona fide revolving commitments outstanding under the ABL Credit Agreement was reduced to $120 million, and thus the Maximum ABL Facility Amount was exceeded by $415 million.  Pursuant to the Intercreditor Agreement, the $275 million of Term Out Loans under the ABL Credit Agreement are Excluded ABL Claims, thus decreasing the Maximum ABL Facility Amount, which also was decreased by the $140 million of Illusory Commitments.  Excluded ABL Claims may not be paid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full and, therefore, the Term Out Loans may not be repaid with the proceeds of Liquid Collateral until the SCP Term Loan is repaid in full, because only the $120 million Letter of Credit Facility could be (and was) so repaid before exceeding the Maximum ABL Facility Amount.  Since the Term Out Loans have been repaid with the proceeds of Liquid Collateral, all such repayment amounts must be disgorged or turned over to the SCP Lenders.

86.     Between the First Amendment closing date and the Petition Date, approximately $129 million of the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amount should have been applied to repay the SCP Term Loan.  Since the Petition Date, approximately $103 million of the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amount should have been applied to repay the SCP Term Loan.

87.    Since the Term Out Loans have been repaid with proceeds of Liquid Collateral, the payments made on account of the Term Out Loans, as remitted to the Hedge Fund Lenders by the ABL Agent, were contrary to Plaintiff's rights and benefits under the Intercreditor Agreement.

88.    Accordingly, under the Intercreditor Agreement, the SCP Lenders were entitled to receive the payments made on account of the Term Out Loans.

89.    The ABL Agent breached the Intercreditor Agreement by remitting the $232 million in payments to the Hedge Fund Lenders, as they have no legitimate claim or right to these amounts under the contract.

90.    The ABL Agent breached its duty of good faith and fair dealing under the Intercreditor Agreement when it assisted or enabled the Hedge Fund Lenders to structure the October 2014 Transactions in a manner that deprived, and continues to deprive, the SCP Lenders of their priority rights in the proceeds of the Liquid Collateral.

91.    To the extent that the ABL Agent assisted or enabled the Hedge Fund Lenders to manipulate the CDS market and structure the October 2014 Transactions and thereby deprived the SCP Lenders of their priority rights in the proceeds of the Liquid Collateral, the ABL Agent breached its duty of good faith and fair dealing under the Intercreditor Agreement.

92.    Based on the foregoing, the ABL Agent has breached and is continuing to breach the Intercreditor Agreement, including its implied covenant of good faith and fair dealing, by (i) collecting and remitting the payments to the Hedge Fund Lenders and (ii) enabling and assisting the Hedge Fund Lenders to improperly claim priority over the SCP Term Loan with respect to the proceeds of Liquid Collateral on account of the Term Out Loans and maintaining the Illusory Commitments in order to artificially increase the Maximum ABL Facility Amount –

all to the detriment of Plaintiff, which has been deprived of receiving its bargained-for benefits under the Intercreditor Agreement.

93.     Plaintiff has been damaged by the ABL Agent's actions, which undermined and wrongfully diverted to the Hedge Fund Lenders the rights properly inuring to the benefit of Plaintiff under the Intercreditor Agreement.

94.     Accordingly, Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### Tortious Interference With Contract

95.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

96.     On or about December 10, 2013, the SCP Lenders and SCP Agent entered into the SCP Credit Agreement with RadioShack.  The SCP Credit Agreement constitutes a valid contract that remains in full force and effect.

97.     Also on or about December 10, 2013, the respective agents for the SCP Lenders and ABL Lenders entered into the Intercreditor Agreement, which sets forth the relative rights and priorities of the SCP Lenders and the ABL Lenders in connection with RadioShack's obligations to both lenders on account of the $835 million financing package it received from them on December 10, 2013.

98.     The SCP Lenders and Hedge Fund Lenders are not parties to the Intercreditor Agreement, but they are explicitly recognized as intended third party beneficiaries under Section 12.11 of the Intercreditor Agreement.

99.     Section 5.1 of the Intercreditor Agreement provides that the agreement shall continue to be applicable "both before and after the commencement of any Insolvency

Proceeding in respect of any Credit Party … [and] [t]he relative rights of the Secured Parties in respect of any Collateral or proceeds thereof shall continue after the commencement … of any such Insolvency Proceeding on the same basis…." Accordingly, the Intercreditor Agreement constitutes a valid contract that remains in full force and effect.

100.    At all relevant times, (i) the Hedge Fund Lenders had knowledge of the Intercreditor Agreement and (ii) the ABL Agent and Hedge Fund Lenders had knowledge of the SCP Credit Agreement.

101.    After the October 2014 Transactions, the Hedge Fund Lenders intentionally, and without justification, interfered with the SCP Lenders' rightful receipt of benefits inuring to them under the Intercreditor Agreement and SCP Credit Agreement.

102.    The Hedge Fund Lenders procured a breach of the Intercreditor Agreement when they intentionally caused the ABL Agent to improperly remit to the Hedge Fund Lenders payments by RadioShack from the proceeds of Liquid Collateral, to the detriment of the SCP Lenders and their superior rights to those proceeds under the Intercreditor Agreement.

103.    The Hedge Fund Lenders and ABL Agent also induced RadioShack to breach the SCP Credit Agreement by intentionally seeking repayment from RadioShack, through the ABL Agent, on account of the Term Out Loans with the proceeds of Liquid Collateral. RadioShack's subsequent payments with the proceeds of Liquid Collateral breached its obligations to the SCP Lenders and SCP Agent under the SCP Credit Agreement, as RadioShack was obligated to make those payments to the SCP Agent for the benefit of the SCP Lenders, because only the $120 million Letter of Credit Facility could be repaid with the proceeds of Liquid Collateral before exceeding the Maximum ABL Facility Amount.

104.    As a result of (i) the Hedge Fund Lenders' tortious interference with the Intercreditor Agreement and (ii) the ABL Agent's and Hedge Fund Lenders' tortious interference with the SCP Credit Agreement, Plaintiff has sustained damages in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION
### Unjust Enrichment

105.    Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

106.    Since the First Amendment closing date, the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amounts should have been applied to repay the SCP Term Loan, because only the $120 million Letter of Credit Facility could be repaid with the proceeds of Liquid Collateral before exceeding the Maximum ABL Facility Amount.

107.    To date, no portion of these payments have been applied to repay the SCP Term Loan.

108.    The Hedge Fund Lenders have no legitimate claim to these amounts to which Plaintiff is entitled.  The Hedge Fund Lenders have conferred a benefit upon themselves for which they have no entitlement.

109.    It is against equity and good conscience to permit the Hedge Fund Lenders to retain the payments, and the Hedge Fund Lenders will be unjustly enriched if not forced to disgorge or turn over the payment amounts and/or the value of the benefit derived therefrom to the SCP Lenders.

110.    Accordingly, Plaintiff is entitled to damages for unjust enrichment and judgment requiring the Hedge Fund Lenders to turn over any and all amounts received in

connection with the Term Out Loans and held in constructive trust for the benefit of the SCP Lenders.

**EIGHTH CAUSE OF ACTION**
**Money Had And Received**

111.     Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

112.     Since the First Amendment closing date, the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amounts should have been applied to repay the SCP Term Loan, because only the $120 million Letter of Credit Facility could be repaid with the proceeds of Liquid Collateral before exceeding the Maximum ABL Facility Amount.

113.     As set forth herein, the Hedge Fund Lenders have no legitimate claim to these amounts to which Plaintiff is entitled.

114.     To date, no portion of these payments have been applied to repay the SCP Term Loan, and the Hedge Fund Lenders have retained all amounts for their own benefit.

115.     Thus, the sum total of money had and received by the Hedge Fund Lenders is  at least $232 million.

116.     Equity and good conscience dictate that the Hedge Fund Lenders should not be permitted to keep the payments to which Plaintiff is rightfully entitled.

117.     Accordingly, Plaintiff is entitled to damages for money had and received in the amount of $232 million and judgment requiring the Hedge Fund Lenders and the ABL Agent to turn over any and all amounts received in connection with the Term Out Loans.

## NINTH CAUSE OF ACTION
### Conversion

118.    Plaintiff hereby repeats and re-alleges each of the above paragraphs as though fully set forth here.

119.    Since the First Amendment closing date, the Term Out Loans were repaid to the Hedge Fund Lenders with the proceeds of Liquid Collateral contrary to the terms of the Intercreditor Agreement, which amounts should have been applied to repay the SCP Term Loan, because only the $120 million Letter of Credit Facility could be repaid with the proceeds of Liquid Collateral before exceeding the Maximum ABL Facility Amount.

120.    As between them and the Hedge Fund Lenders, the SCP Lenders have a superior right to possession and ownership of the payments retained by the Hedge Fund Lenders on account of the Term Out Loans, because only the $120 million Letter of Credit Facility could be repaid with the proceeds of Liquid Collateral before exceeding the Maximum ABL Facility Amount.

121.    The Hedge Fund Lenders' actions in accepting and retaining the payments made on account of the Term Out Loans constitute an unauthorized exercise of dominion and control over the payments in question, to the exclusion of the SCP Lenders' rights.

122.    The Hedge Fund Lenders have kept the payments in question for their own use and benefit, to the exclusion of the SCP Lenders' rights and entitlement to the funds.

123.    As a result of the Hedge Fund Lenders' conversion of money rightfully belonging to the SCP Lenders, the SCP Lenders have suffered losses in the amount of the converted payments the Hedge Fund Lenders received on account of the Term Out Loans and damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Issue a declaratory judgment determining the total amount of the loans under the ABL Credit Agreement that may be repaid with the proceeds of Liquid Collateral prior to the repayment in full of the SCP Term Loan;

B.  Order the Hedge Fund Lenders and ABL Agent to disgorge or turn over to the SCP Lenders any and all amounts received in connection with the Term Out Loans;

C.  Order the Hedge Fund Lenders and ABL Agent to specifically perform their obligations under the Intercreditor Agreement;

D.  Award monetary damages in an amount to be determined at trial;

E.  Award reasonable attorneys' fees and costs; and

F.  Award such other and further relief that the Court deems just and proper.

Dated:      Wilmington, Delaware
            May 22, 2015

                            SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                            */s/ Anthony W. Clark*
                            Anthony W. Clark (I.D. No. 2051)
                            Jason M. Liberi (I.D. No. 4425)
                            One Rodney Square
                            P.O. Box 636
                            Wilmington, Delaware 19899-0636
                            Telephone:  (302) 651-3000
                            email: anthony.clark@skadden.com
                            email: jason.liberi@skadden.com

                            - and -

                            Jay M. Goffman
                            Mark A. McDermott
                            Four Times Square
                            New York, New York 10036-6522
                            Telephone:  (212) 735-3000
                            email: jay.goffman@skadden.com

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Cantor Fitzgerald Securities LLC, BlueCrest Multi Strategy Credit Master Fund Limited, DW Catalyst Master Fund, Ltd., DW Value Master Fund, Ltd.; Saba Capital Management, LP, Macquarie Credit Nexus Master Fund Limited, Taconic Opportunity Master Fund L.P., Taconic Master Fund 1.5 L.P., Mudrick Capital Management, LP., and John Does #1-50*

CHOATE, HALL & STEWART LLP

*/s/ John F. Ventola*

John F. Ventola
Douglas R. Gooding
Sean M. Monahan
Two International Place
Boston, Massachusetts 02110
Phone: (617) 248-5000
Facsimile: (617) 248-4000
email: jventola@choate.com
email: dgooding@choate.com
email: smonahan@choate.com

*Counsel for Plaintiff Salus Capital Partners, LLC, as agent, with respect to claims against Defendants Standard Wireless Inc., General Wireless Inc., Standard General L.P., General Retail Holdings L.P., General Retail Funding LLC, Litespeed Master Fund, Ltd., Litespeed Management, L.L.C., and T. Rowe Price Associates, Inc.*